[No. 24516-3-I.   Division One.   September 9, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. RICK MELVIN
PEERSON, *Appellant*.

*Patricia S. Novotny* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Theresa L. Fricke, Senior Appellate Attorney,* for respondent.

AGID, J. — The State charged Rick Melvin Peerson with two counts of first degree assault and two counts of aggravated first degree murder, alleging as the aggravating circumstance that on or about November 25, 1986, Peerson assaulted Mack Smith and Rick Damiano and murdered Thomas Mott and Roger Fox as part of a "common scheme or plan". Peerson was convicted on all four counts. He appeals, challenging (1) the trial court's entry of judgment despite arguably inconsistent jury verdicts, (2) the sufficiency of the "to-convict" jury instructions, (3) the trial court's admission of incriminating statements Peerson made while in police custody, and (4) "prior bad act" evidence admitted under ER 404(b) and ER 403. We affirm.

Peerson made his living selling marijuana to retail buyers in South King County. His main suppliers were Ron Anderson, Mark Diemert, Blade Dufor and Roger Fox.[1] Peerson was very familiar with these growers. He knew that Fox and Diemert operated large grow operations in their basements and that Anderson operated an extensive grow business in two Woodinville houses.[2] Peerson had been to the ranch house and had also worked on occasion at Fox's house. All the growers with whom Peerson did business were closely connected with each other. Anderson met Fox and Diemert through Dufor and helped all three start their own grow operations. Although Anderson, Diemert, Dufor and Fox operated their grow houses independently, Anderson described them as a "loose knit family", helping each other out when they needed it.

---

[1] Dufor and Fox operated a grow business as partners.

[2] Hereafter referred to as "the ranch house" and "the big house".

In May 1986, Peerson was in an automobile accident in which he and his two young children were seriously injured. Having incurred substantial medical bills, Peerson's financial situation severely declined, and he became desperate for money. After the accident, Anderson, Dufor, Fox and Diemert decided not to do business with Peerson any longer, both because Peerson had failed to pay Anderson for some marijuana and because his behavior had been bizarre since the accident.

In August 1986,[3] Peerson telephoned Diemert, asking if he had any marijuana for sale. Diemert told him that he had none and was getting out of the business. Peerson verbally threatened Diemert and said that he was after Dufor and Anderson as well. A few minutes later, Peerson appeared at Diemert's house, armed with an Uzi, and directed him to lie on the floor. He then handcuffed and tied up Diemert and kicked him in the face. Peerson threatened that, "if we were going [to] cut him off and use him like that, that he was going to kill us, all of us, for doing that." He also expressed his anger toward Dufor and Anderson, telling Diemert "that he was going to call them both and get them both over there and then kill us all." Peerson tried to call Dufor and Anderson, but got no answer. He kept Diemert and Mark,[4] who had stopped by, on the floor for 3 hours. According to Diemert, Peerson was "enraged" and "out of control". Peerson finally left after Diemert and Mark each promised to give him $5,000.

As soon as Peerson left the house, Diemert, emotionally distraught, left his home and never returned. Two days later, Peerson telephoned Mark's house and asked for the $5,000. Diemert spoke with Peerson and told him he would give him nothing. Peerson replied, "I guess I should

---

[3]The events we are about to describe are referred to in this opinion as the "August incident". Before trial, defense counsel moved to exclude evidence of this incident under ER 404(b). This issue is analyzed in part IV of this opinion.

[4]Peerson also handcuffed and bound Mark and kicked him in the face.

have killed you when I had the chance." He told Diemert and Mark that he would kill their family members and then kill them. Diemert and Dufor immediately packed their belongings and moved back to California.[5]

Peerson later called Anderson twice, demanding that he get Diemert and Mark to drop the charges they had filed against him. He also wanted their telephone numbers. He threatened to have everyone arrested and killed in prison. Frightened by his threats, Anderson immediately left his house and moved into a security condominium. Although he was concerned for his own safety, Anderson decided to risk another crop for the money. He closed up the big house and took special security precautions at the ranch house. He hired Damiano to manage the ranch house crop and gave him a description of Peerson. Smith and Mott continued to work for Anderson at the ranch house as well.

On November 25, 1986, Smith, Damiano and Mott were at the ranch house. Mott left the ranch house at 7:15 p.m. in a white GMC pickup truck that belonged to Anderson. Around 9 p.m., Smith and Damiano heard a loud noise. Smith discovered that a basement window had been broken. While Smith was calling Anderson about the break-in, Damiano saw someone walk by the front door and then heard someone banging on the door, yelling "Police. Police. This is a raid." Smith recognized the voice as Peerson's.

Although Smith never got a good look at the man's face, he identified Peerson at trial as the attacker.[6] Damiano testified that the attacker struck him in the head with a large crescent wrench, and a struggle ensued. Smith chased the attacker outside with a stove poker, but he soon returned swinging a large metal sprinkler attached to a hose. Both men escaped, Damiano out of a second story window. He landed on broken glass, injuring his arm.

---

[5]Fox stayed behind to harvest one more crop for financial reasons.

[6]The attacker was wearing a hooded sweatshirt.

The two men fled in Smith's van, passing Anderson's white GMC truck parked along the road. Smith wanted to stop and look for Mott, his stepson, but Damiano was in pain and incoherent and persuaded Smith to keep driving. Smith took Damiano to the hospital, where he received eight stitches for a head wound. Damiano gave a statement to police later that night.

Police found Mott's body in a drainage ditch near Anderson's abandoned white truck. Mott had died from a combination of drowning and a fractured skull. Injuries caused by blows to Mott's head were consistent with the use of a 16-inch crescent wrench. He died sometime between 5 p.m. on November 25 and 5 a.m. on November 26.

A friend of Fox's discovered his body tied up on the stairway of his home. Fox had been bound with ropes and cords in a way that ensured his slow death by strangulation. As the friend ran out of the house, he saw one of Fox's bows on the stairway. He also noticed that Fox's red Chevy truck was not at the house. The police found Fox's body and a large marijuana grow operation in his house. He had been assaulted 20 times with a blunt instrument in his head and face. Fox's lacerations had a "cookie cutter" effect, consistent with blows inflicted by a 16-inch crescent wrench. According to the medical examiner, Fox died between 11 p.m. on November 25 and 4 a.m. on November 26.

On the morning of November 26, Peerson stopped by his friend Major Hixon's apartment. He was driving a new red Chevy pickup truck. As he left Hixon's room, Peerson stated "that there was 97 more people on his list that he was going to kill." He asked his friend Lynn Schultz, who was also there, for some telephone equipment. Schultz and Peerson left together.

Shortly thereafter, Peerson and Schultz arrived at Douglas Wiren's house. Ernie Kitchen and "Tommy" were also there. Wiren, Kitchen and Peerson had been friends for many years. Peerson told them that he had taken the

new red truck he was driving from a guy who owed him money in satisfaction of a debt. Wiren or Kitchen instructed Tommy to remove the tires and stereo from the truck. Peerson told Kitchen and Wiren that he had 10 pounds of marijuana at a house in Woodinville. The three men drove to Woodinville in Kitchen's old truck. As they neared the house in Woodinville, they passed a white GMC truck parked along the road. Peerson said that if the truck was still there it was safe to take the marijuana, because the police were not yet involved. He told Kitchen and Wiren that he had burglarized the house and then stashed some marijuana and weapons in the bushes. He went into the woods to retrieve them.

While waiting for Peerson, Wiren and Kitchen noticed a police car driving by. Aware of the police car, Peerson came running out of the bushes and directed his friends to get out of there because, "There is a dead guy in the house." Peerson carried out of the bushes a garbage bag filled with several items, a bow and a 12-gauge shotgun. Peerson then began to tell Kitchen and Wiren how he had assaulted two people and murdered two others. He explained that, after he broke into the house and took the marijuana and weapons he had just retrieved, he returned to the house and waited for the guy to come home from work. When the guy got home, Peerson struck him with a crescent wrench, and then tied him up in a way that he would choke himself to death. He then took some "leaf" and spread it through the house to make it look like a drug-related murder. He assured Kitchen and Wiren that the police would not do much about the murder because it was drug related.

Peerson also told them that there was another dead man in the ditch next to the white truck. He said he had stopped the truck and claimed to be a narcotics officer. When the guy got out of the truck and put up his hands, Peerson hit him in the head with the crescent wrench. He then dragged him to a ditch and held him under water until he drowned.

Finally, Peerson told them he had attacked two men in another grow house not far away. He had chased them with a hose and sprinkler and had also used the crescent wrench on the man in the house. He said one of the men escaped by jumping out of a window.

After the three returned to Wiren's house, Kitchen drove the red truck to Issaquah and ditched it, according to Peerson's instructions. Peerson gave Wiren some items to hold for him, including the bow, shotgun and garbage bag. In the bag were items from the glove box of the red truck, including some photographs and an address book. Peerson went through the photos and pointed to men who were dead and to others who "were going to be dead." He said he wanted to leave town and let things cool off. After several hours, Wiren drove Peerson to Portland.

The next morning, Wiren heard of the Woodinville homicides. He and Kitchen telephoned police a few days later. They turned over to police all of the items that Peerson had left with them, including the bow, which Wiren identified at trial.

Lori Honeywell, Peerson's girl friend, testified that on November 27, 1986, Peerson telephoned her at a friend's apartment. She had heard of the homicides in Woodinville. Honeywell was crying and told Peerson that people were saying terrible things about him. She asked if they were true. He said "Yes."

On December 5, 1986, Peerson showed up at his aunt Ardis Olgard's house in Fargo, North Dakota. He had not seen his aunt since 1980. Olgard knew that the Washington police were looking for Peerson as a homicide suspect. When Peerson left to get a haircut, the Olgards notified police. Officers set up surveillance in their house. Peerson did not return until 10 a.m. the following morning. He was carrying a brown paper bag. He resisted arrest and was shot by officers.[7] The brown paper bag contained two airline tickets in Fox's name.

---

[7] During the struggle Peerson also shot two officers. He pleaded guilty to assaulting the officers and was sentenced to a 20-year prison term.

Peerson testified on his own behalf. He denied having any involvement in the Damiano and Smith assaults and Fox and Mott murders. Although he acknowledged the August incident, he denied ever threatening to kill anyone.

After the jury found Peerson guilty as charged, the court entered judgment and sentenced him to life imprisonment without possibility of parole pursuant to RCW 10.95.030.[8] This appeal followed.

## I
### JURY VERDICTS

For the aggravated first degree murder counts, the jury answered special verdicts concerning the aggravating circumstances. As to count 1, charging Peerson with the aggravated murder of Fox, the jury returned the following special verdict:

> We, the jury, find that the State has proved beyond a reasonable doubt that the following aggravating circumstance(s) exist as to count I:
> __No__ (a) There was more than one murder victim and the murders were part of a common scheme or plan of the defendant;
> __Yes__ (b) The murder was committed in the course of, or in furtherance of, or in immediate flight from the crime of burglary in the first degree.

As to count 2, in which Peerson was charged with the aggravated murder of Mott, the jury's special verdict read as follows:

> We, the jury, find that the State has proved beyond a reasonable doubt that the following aggravating circumstance(s) exist as to count II:
> __Yes__ (a) There was more than one murder victim and the murders were part of a common scheme or plan of the defendant.

Although the jury returned general verdicts finding Peerson guilty of first degree aggravated murder on both counts, the special verdicts indicate it found that only

---

[8]The State had requested the death penalty, but the jury was unable to reach unanimous agreement on death.

Mott was murdered as part of a common scheme or plan. Peerson contends that because the jury must find that the defendant murdered more than one person as part of a common scheme or plan before it can find that this aggravating circumstance has been proved, the trial court should have vacated his conviction on count 2 when it realized the jury had not found that Peerson also murdered Fox as part of a common scheme or plan.

RCW 10.95.020 lists several aggravating circumstances, the existence of which will raise premeditated first degree murder to aggravated first degree murder punishable by mandatory life imprisonment or death. *State v. Kincaid*, 103 Wn.2d 304, 307, 692 P.2d 823 (1985). The aggravating circumstance at issue here states:

> There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person[.]

RCW 10.95.020(8).

The common scheme or plan aggravating circumstance plainly requires that the scheme or plan result in more than one death. *See State v. Guloy*, 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). However, "[a] special finding will not control a general verdict unless it is so irreconcilably inconsistent that it cannot otherwise be interpreted. *State v. Robinson*, 84 Wn.2d 42, 523 P.2d 1192 (1974)." *State v. Eker*, 40 Wn. App. 134, 139-40, 697 P.2d 273, *review denied*, 104 Wn.2d 1002 (1985); *see also State v. Longworth*, 52 Wn. App. 453, 464, 761 P.2d 67 (1988) (holding that when a special verdict, although susceptible to more than one interpretation, can be construed to support the general verdict, the court should so construe it), *review denied*, 112 Wn.2d 1006 (1989). In addition, when a jury's guilty verdict on one count is inconsistent with its acquittal on another count, the inconsistency does not constitute reversible error if the guilty verdict is supported by sufficient evidence. *State v. Ng*, 110 Wn.2d 32, 48, 750 P.2d 632 (1988).

We must therefore determine whether we can reconcile the verdicts without doing violence to logic.

In this case, there are two ways in which the jury verdicts can be reconciled. First, the jury may have determined from evidence of the sequence of events and times of death that Fox was killed first and that, because Peerson had not yet killed Mott when he killed Fox, the scheme or plan sequence was not completed until two murders were committed. Based on this determination, the jury could have concluded that, technically, Fox could not have been murdered as part of a common scheme or plan until Mott's murder was accomplished.

Second, the "to-convict" instruction for count 1 instructed jurors to find that (a) defendant murdered Fox in the course of committing first degree burglary; OR (b) defendant committed more than one murder as part of a common scheme or plan. A reasonable jury could have interpreted the "OR" as requiring only that it find the State proved one of the aggravating circumstances beyond a reasonable doubt. Further, the jury could have decided to "choose" the first aggravating circumstance because it was obvious and because it was not sure if there could be a common scheme or plan until both men were murdered.

Moreover, there is abundant evidence to support the conclusion that Peerson murdered both Fox and Mott as part of a common scheme or plan to take revenge on the network of growers who had cut off his marijuana supply. This includes the strong evidence of Peerson's motive for killing the growers, the testimony of Kitchen, Wiren and Honeywell that Peerson confessed to the assaults and murders, Peerson's prior assault on Diemert and his subsequent threats against Diemert, Anderson (Mott's employer) and Dufor (Fox's partner), the physical evidence that Kitchen and Wiren turned over to police, and Peerson's flight from the state, with a stopover in California,[9] where Diemert and Dufor had fled to escape from him.

---

[9] One of the plane tickets recovered from Peerson by the Fargo, North Dakota, police had been used for a trip to San Diego.

## II
### SUFFICIENCY OF "TO-CONVICT" INSTRUCTIONS

Peerson next contends that the trial court erred in refusing both to limit the "common scheme or plan" language in the jury instructions and to define that term. We turn first to his contention that the trial court should have limited the nature of the common scheme or plan that the jury could find.

Peerson asserts that the trial court should have required the jury to (1) describe in a special verdict form the common scheme or plan it did find, or (2) find, as a prerequisite to finding the aggravating circumstance, that the State proved the specific scheme or plan alleged in its bill of particulars. Peerson cites no authority for the first argument, and we have found none. Assignments of error not supported by citations to authority need not be considered. *E.g., State v. Hartley*, 51 Wn. App. 442, 449, 754 P.2d 131 (1988); RAP 10.3(a)(5). Even if we were to consider this argument, we would reject it. In essence, Peerson argues that the court should have required the jurors to make findings of fact to support their conclusion that Peerson murdered Mott in furtherance of a common scheme or plan. Jurors are not trained as attorneys and could have great difficulty in following such an instruction. In addition, requiring jurors to state their factual findings in their own language could result in impermissible impeachment of the jury's verdict. *See State v. Simmons*, 35 Wn. App. 421, 667 P.2d 133, *review denied*, 100 Wn.2d 1025 (1983); *Rowe v. Safeway Stores, Inc.*, 14 Wn.2d 363, 373, 128 P.2d 293 (1942) (jury's informal language injected into a general verdict could render it fatally vague, ambiguous or contradictory).

We also reject Peerson's second argument. Early in the proceedings, the trial court granted Peerson's request for a bill of particulars, asking the State to specify the common scheme or plan alleged in counts 1 and 2. The State's response set forth the following particulars as to those counts:

4. The state alleges that Rick Melvin Peerson attacked Richard Damiano, Mack Smith, Thomas Mott and Roger Fox as part of a single scheme or plan intending to murder them all.

As Peerson acknowledges, the purpose of the bill of particulars is to give the defendant sufficient notice of the charge so that he can competently defend against it. *State v. Devine*, 84 Wn.2d 467, 471, 527 P.2d 72 (1974). This notice requirement stems from the defendant's due process right to be tried only for stated offenses. *State v. Dictado*, 102 Wn.2d 277, 284-85, 687 P.2d 172 (1984); *State v. Carr*, 97 Wn.2d 436, 439, 645 P.2d 1098 (1982). However, while Peerson apparently argues that the trial court's failure to instruct the jury that it must find the specific scheme or plan alleged in the bill of particulars denied him due process, he alleges no prejudice, nor does he give any indication that he was unaware of what the State sought to prove.[10] The cases on which Peerson relies to support this contention are inapposite.

In *State v. Thomas*, 210 Conn. 199, 554 A.2d 1048 (1989), the court held that the State was limited to proving the charged crime in substantially the manner described in the bill of particulars. Thus, it could not prove the charged crime of weapons possession by demonstrating that the defendant was carrying a straight razor when it had alleged in the bill of particulars that the defendant had committed the crime by his possession of a knife. 210 Conn. at 210.

Similarly, in *State v. Trujillo*, 12 Conn. App. 320, 531 A.2d 142, *cert. denied*, 205 Conn. 812 (1987), the State's bill of particulars indicated that it would prove the charged crime by showing that the defendant intention-

---

[10]In fact, as the State points out, Peerson appears to be arguing that because the jury verdicts were inconsistent, as a matter of law, the jury could not have found that the State proved the common scheme or plan alleged in the bill of particulars because the inconsistent verdicts show that Fox was not killed as part of a plan to kill him and Mott. As our discussion of the verdicts in part I of this opinion demonstrates, they do not compel such a conclusion, and Peerson's bootstrapping argument must fail.

ally burned the victim with a hot iron. However, the court's instructions allowed the jury to convict if it found that the defendant had acted recklessly. 12 Conn. App. at 322. Relying on the State's theory of intentional conduct alleged in the bill of particulars, the defendant prepared a defense based on his contention that the victim accidentally caused her own injury. Because the instruction allowed the jury to find the defendant guilty even if he did not act intentionally, the instruction was in error because the defendant had been prejudiced in preparing his defense. 12 Conn. App. at 328-29.

■ Unlike *Thomas* and *Trujillo*, however, the jury here was not instructed that it could find Peerson guilty on any theory other than the one alleged in the bill of particulars: that Peerson murdered Mott and Fox as part of a plan to murder the four named individuals. The trial court's instruction deviated from the bill of particulars only insofar as it did not name the specific victims Peerson allegedly murdered and attempted to murder. The instruction in no way permitted the jury to convict Peerson of aggravated murder on a theory different from that alleged in the bill of particulars.[11]

Even more important, Peerson's defense could not have been prejudiced by the trial court's refusal to name the individual victims named in the bill of particulars in its instructions. Peerson defended against the charges by totally denying any involvement in the assaults or murders. His defense would therefore be the same no matter what language the trial court used in the jury instructions.

Moreover, this aggravating circumstance was the subject of both a pretrial defense motion to dismiss and extensive colloquy during the CrR 3.5/CrR 3.6 pretrial

[11]Nor does Peerson demonstrate that the State even presented an alternative theory not alleged in the bill of particulars. The record reveals that only one scheme or plan could be proved by the evidence presented: that Peerson intended to murder Mott, Fox, Damiano and Smith (as well as Anderson, Dufor and others) in furtherance of his plan to get rid of the ingrates who had cut off his marijuana supply at a time when he desperately needed money.

hearings.[12] Thus, Peerson had sufficient notice of the State's theory. Even if the instructions had somehow permitted the jury to convict Peerson on a theory not alleged in the bill of particulars, Peerson's defense could not have been prejudiced by those instructions.

■ Peerson also argues that the trial court was required to define the phrase "common scheme or plan" in its jury instructions. However, our Supreme Court has previously rejected this contention in *State v. Jeffries*, 105 Wn.2d 398, 420, 717 P.2d 722, *cert. denied*, 479 U.S. 922 (1986), in the same aggravating circumstance context as it was presented here. As the court there stated, "the jury was simply told to decide whether there was a scheme or plan involved; such a simplistic request needs no definition." 105 Wn.2d at 420. *See also Guloy*, 104 Wn.2d at 417.[13]

■ Peerson also argues that the phrase must be defined in the instructions in order to ensure jury unanimity. However, the trial court properly instructed jurors that they had to unanimously find that the State had proved the "common scheme or plan" aggravating factor beyond a reasonable doubt. There is no requirement that the jurors unanimously agree on the facts supporting the existence of that circumstance. *In re Jeffries*, 110 Wn.2d 326, 339-40, 752 P.2d 1338, *cert. denied*, 488 U.S. 948 (1988); *accord, Longworth*, 52 Wn. App. at 464-65.

---

[12]Several months before trial, the State gave notice of its intention to introduce evidence of the August incident, which it argued was relevant in part to show the existence of the common scheme or plan aggravating circumstance. Thus, the nature of the scheme or plan was argued during the hearing on the State's pretrial motion to have the "prior bad acts" evidence admitted under ER 404(b).

[13]Citing the dissent in *Jeffries*, as well as the dissents in two other cases decided in other jurisdictions, Peerson apparently argues that *Jeffries* was wrongly decided and that this court should overrule it. Even if we did not agree with the decision in *Jeffries*, which we do, we are bound by directly controlling authority decided by our Supreme Court unless it is overruled by that court. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227, 39 A.L.R.4th 975 (1984).

■ Peerson's last argument relating to the sufficiency of the instructions asserts that the trial court should have used his proposed instructions limiting and/or defining the "common scheme or plan" language. "Instructions are sufficient if they correctly state the law, are not misleading, and permit the parties to argue their theories of the case." *State v. Vahey*, 49 Wn. App. 767, 772-73, 746 P.2d 327 (1987), *review denied*, 110 Wn.2d 1013 (1988). Because we find that the trial court correctly stated the law and that no further specification of the plan or definition of the phrase was necessary, we conclude that the court's refusal to use Peerson's proposed instructions was correct.

## III
### ADMISSIBILITY OF PEERSON'S INCRIMINATING STATEMENTS

After sustaining serious injuries during his arrest, Peerson was taken to a Fargo, North Dakota, hospital where he remained through December 31. He was in a halo, a device physically attached to his head to prevent or limit head movement because of a bullet still in his neck. The halo caused him to hear strange sounds in his head and to magnify sounds when something touched the halo.

Fargo police guarded him closely 24 hours a day in his hospital room. The officers kept a log in which they recorded notes of everything Peerson said. Peerson was aware that the officers were taking notes of his conversations while he talked on the telephone.

For the first few days of his hospitalization, Peerson was "very incapacitated." After that, he was handcuffed and his uninjured leg was secured to the bed. On December 9, Peerson was given morphine and Valium and had been sleeping before an officer woke him and read him his *Miranda* rights. That same afternoon, Peerson asked Officer Warren about the procedure for getting a lawyer. Officer Warren responded that an attorney could be appointed for Peerson once he was arraigned in the local

county court, or that Peerson could call a local private attorney. Peerson does not contend that he pursued the matter further.

On December 15, depressed about his impending leg surgery and emotionally distraught after a telephone conversation with his girl friend, Peerson lost control of himself and asked to be handcuffed with both hands to the bed. A psychiatrist was called who gave Peerson some Valium before he left. A half hour later, Peerson telephoned his father. He was still upset and handcuffed to his bed. Officer Warren overheard Peerson tell his father, "I should have done everybody in that owed me money. I could have been Rambo, but I left town." Between the conversation with his girl friend and the telephone call to his father, Peerson made other incriminating statements to Officer Warren. He told Warren "that everybody in town that owed him money thought he was going to kill them." He also said that one guy owed him some money and Peerson "bit [the guy's] nose off."

Defense counsel moved to suppress the statements made by Peerson to his father and Officer Warren. The trial court denied the motion, finding that Peerson had not made the statements in response to any police interrogation, that he knew Officer Warren was listening to and taking notes of his telephone conversations, and that his emotional and medicated state went to the weight rather than the admissibility of the statements. Peerson assigns error to the trial court's ruling, contending that the incriminating statements[14] were inadmissible because he did not make them voluntarily and because he was not appointed a lawyer after he asked about the procedure for obtaining one.

■ ■ The rights to counsel and to remain silent apply only to situations in which the defendant is in custody and is being interrogated. *Edwards v. Arizona*, 451 U.S.

---

[14]Peerson characterizes these statements as "confessions". While incriminating, the statements are not admissions that he committed the charged crimes and thus are not confessions.

477, 485-86, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). Peerson, under 24-hour police surveillance in his hospital room, was clearly in custody. However, it is undisputed that Peerson did not make the statements in response to any questions posed by Officer Warren and that the statements were spontaneous. Thus, we find no evidence that Peerson was being interrogated when he made the incriminating statements.

Peerson argues, however, that his physical pain and depression, the confinement of his head in the halo device, his medicated state, and the 24-hour surveillance by the note-taking officers, were the functional equivalent of the interrogation found to be unconstitutional in *Mincey v. Arizona*, 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978). Peerson's reliance on *Mincey* is misplaced. Mincey's statements were the product of the officer's unrelenting interrogation which continued even after Mincey repeatedly asked the officer to stop the questioning and get him an attorney.[15] 437 U.S. at 398-401. When, as here, the officer has posed no question to the defendant, *Mincey* simply does not apply.

Only questions that are "reasonably likely to elicit an incriminating response" from the defendant can be characterized as "equivalent" to interrogation. *State v. Bradley*, 105 Wn.2d 898, 903-04, 719 P.2d 546 (1986). Here, the record is devoid of any evidence that Officer Warren acted in any way or said anything that was reasonably likely to elicit an incriminating response.

---

[15]Mincey's and Peerson's conditions are not sufficiently factually analogous to characterize Peerson's statements as not "'the product of his free and rational choice.'" *Mincey*, 437 U.S. at 401 (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 20 L. Ed. 2d 77, 88 S. Ct. 1152 (1968)). Mincey was questioned the night he was shot, when he was still in intensive care and suffering from unbearable pain. He could not speak because of the tubes in his mouth and a breathing apparatus. He had to write his responses to the officer's questions, and the court observed that "some of his written answers were on their face not entirely coherent." 437 U.S. at 398-99. In contrast, although he was in a halo, receiving pain medication, and emotionally distraught, Peerson was no longer in intensive care and had been making phone calls regularly to family members for several days before he made the statements in question to Officer Warren.

Moreover, given that Peerson was fully aware of Officer Warren's surveillance and notetaking, there was nothing surreptitious about the officer's conduct.

Nor can Peerson argue that his statements to Officer Warren were involuntary due to his physical and emotional suffering. If statements are freely given, spontaneous and not the product of custodial interrogation, they are considered voluntary. *State v. Miner*, 22 Wn. App. 480, 591 P.2d 812, *review denied*, 92 Wn.2d 1011 (1979). In addition, Peerson does not argue that the severity of his condition prohibited him from perceiving the nature of his acts and words. Accordingly, the trial court correctly concluded that, while Peerson's emotional and physical state may affect the weight the jury attributes to the statements, those factors do not affect their admissibility.

Further, absent police interrogation, there can be no infringement on the right to counsel. *Edwards*, 451 U.S. at 486. We therefore find it unnecessary to address Peerson's contention that the State's failure to appoint counsel for him compelled the trial court to exclude the incriminating statements made to Officer Warren.

Peerson's contention that his statements to his father should have been excluded also fails. A defendant's *Miranda*[16] rights can be violated only by the State or a person acting as an agent of the State. *State v. Brooks*, 38 Wn. App. 256, 261-62, 684 P.2d 1371, *review denied*, 103 Wn.2d 1005 (1984); *State v. Cadena*, 74 Wn.2d 185, 190-93, 443 P.2d 826 (1968), *overruled on other grounds in State v. Gosby*, 85 Wn.2d 758, 767, 539 P.2d 680 (1975). Thus, the exclusionary rule does not apply to the acts of private individuals. *In re Teddington*, 116 Wn.2d 761, 770, 808 P.2d 156 (1991). Since Peerson has made no allegation that his father was acting as an arm of the State, his constitutional rights were not infringed, and the statements to his father were properly admitted.

---

[16]*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

## IV
### ADMISSIBILITY OF PRIOR BAD ACTS EVIDENCE

Before trial, the defense moved to suppress testimony regarding Peerson's alleged assault on Diemert and Mark, his contemporaneous threats also referring to Anderson and Dufor, and his threatening telephone calls to Anderson the day after the incident. The trial court denied the motion and ruled that this evidence, as well as the later hasty relocations of Diemert, Dufor and Anderson, were admissible.

After carefully evaluating the evidence of the August incident, the trial judge found it relevant and admissible under ER 404(b) to show motive and common scheme or plan. The judge further found that the evidence was necessary to the State's case and that its probative value outweighed its prejudicial effect under ER 403. However, she excluded on grounds of undue prejudice details of the violence of Peerson's assaults on Diemert and Mark and any testimony concerning the Uzi.

Whether evidence of a defendant's "prior bad acts" is admissible under ER 404(b) is within the sound discretion of the trial court. The court's ruling will not be reversed absent a showing that the trial court abused its discretion. *State v. Lynch*, 58 Wn. App. 83, 87, 792 P.2d 167, *review denied*, 115 Wn.2d 1020 (1990). Although evidence of a defendant's "prior bad acts" is not admissible to establish his character or that he acted in conformity with that character, such evidence may be admissible for other purposes, such as to show motive, intent, identity or plan. *See* ER 404(b).

The trial court must identify for the record the purpose for which the State seeks to introduce the evidence and determine whether the evidence is relevant to prove an essential element of the crime charged. *State v. Smith*, 106 Wn.2d 772, 776-77, 725 P.2d 951 (1986). In determining relevance, the purpose for which the evidence is offered must be of consequence to the outcome of the action, and the evidence must tend to make the existence

of the identified fact more probable. After the court has determined relevance, it must then balance the probative value of the evidence against its prejudicial effect under ER 403. *Smith*, 106 Wn.2d at 776.

The trial court determined on the record that the August incident, Peerson's contemporaneous threats, and the reactions of the growers with whom he had done business were all relevant to motive. Because Peerson had huge medical bills, he was desperate for money, and the growers' actions therefore seriously affected his financial condition. During his assault on Diemert, he expressed his anger at Diemert *and* the other growers, including Anderson and Dufor, for cutting him off. He also tried to get Anderson and Dufor to come to Diemert's house. He further threatened to kill Anderson during three telephone conversations the day after the assault. The assault, the contemporaneous threats, and the subsequent threats against Anderson were all highly probative evidence of Peerson's motive for killing the growers.

Evidence may also be admitted under ER 404(b) to prove an essential element of the charged crime. *State v. Bacotgarcia*, 59 Wn. App. 815, 819, 801 P.2d 993 (1990), *review denied*, 116 Wn.2d 1020 (1991). Here, the evidence was relevant to an essential element of the charged crime of aggravated first degree murder: the common scheme or plan aggravating circumstance. As the trial judge noted after her extensive analysis of the issue, Peerson's confrontation with and threats against Diemert, Anderson and Dufor established a relationship between those threatened and was therefore both relevant and necessary to the State's theory that Peerson had a scheme or plan to kill his victims.

Peerson argues, however, that because the August incident involved only Diemert and Mark and they were not victims of the crimes charged here, the evidence cannot be relevant to scheme or plan. This argument is specious for two reasons. First, during the assault, Peerson tried to contact Anderson and Dufor to get them over to Diemert's

so that he could "confront" them as well. Second, Damiano and Smith, the two assault victims, both worked for Anderson and were the only people at Anderson's ranch house the night Peerson broke in. Mott, one of the murder victims, also worked for Anderson and had been driving Anderson's truck the night he was murdered. Finally, Fox, the other murder victim, was Dufor's partner. Thus, in the context of his numerous global threats against all the growers, Peerson's threats against Anderson and Dufor were also threats against Anderson's employees and Dufor's business partner: the assault and murder victims.

The reactions of those threatened, including Diemert's and Dufor's immediate relocation to California and Anderson's move to a security condominium, were also relevant to show the common scheme. Aside from Anderson, the only grower who stayed in Washington and continued his operation, Fox, was murdered.

Finally, the record shows that the trial judge carefully and accurately balanced the probative value of the evidence against any prejudicial impact it might have. While she acknowledged that Peerson's assault on Diemert and Mark might have some prejudicial effect, she determined that Peerson's threats, Diemert's and Mark's promises of money, and Peerson's later threats against them and their families made after they refused to give him the money would make no sense to the jury if evidence that Peerson had forced them to remain on the floor had been excluded. Because the August incident was clearly necessary to prove the State's case and the trial court excluded the more prejudicial details of the assault, we conclude that the court struck the proper balance in admitting the least prejudicial, yet most relevant, aspects of Peerson's conduct.

In a supplemental pro se brief, Peerson makes several additional arguments, which we reject on the basis that his claims are not supported by the record or citations to relevant authority and are without merit. *State v. Dunaway*, 109 Wn.2d 207, 220, 743 P.2d 1237, 749

P.2d 160 (1987) (matters referred to in an appellate brief but not included in the record cannot be considered on appeal); *State v. Hartley*, 51 Wn. App. 442, 449, 754 P.2d 131 (1988); RAP 10.3(a)(5).

▓ Peerson also raises additional issues, not raised in his supplemental brief, in a pro se reply brief. The State asked this court to strike the reply brief on the basis that it had no opportunity to respond to those issues, and we granted its motion. Peerson now moves this court to reconsider. His motion is denied. *State v. Manthie*, 39 Wn. App. 815, 826 n.1, 696 P.2d 33 (alleged errors raised for the first time in a reply brief need not be reviewed on appeal even if they are of constitutional magnitude), *review denied*, 103 Wn.2d 1042 (1985); RAP 10.3(c). *State v. Kitchen*, 46 Wn. App. 232, 730 P.2d 103 (1986), *aff'd*, 110 Wn.2d 403, 756 P.2d 105 (1988), on which Peerson relies, does not compel a different result. We interpret *Kitchen* to hold that a reviewing court may, but is not compelled to, address errors of constitutional magnitude raised for the first time in a reply brief.

In any event, we have examined Peerson's additional assignments of error and find that we are unable to consider them or that they have no merit. Several of the alleged errors are wholly unsupported by argument or citations to authority and cannot be considered. *State v. Dennison*, 115 Wn.2d 609, 629, 801 P.2d 193 (1990). We are also unable to review his argument that the prosecutor, in allegedly requesting the trial court in the jury's presence to grant Wiren immunity, vouched for Wiren's credibility. Peerson has failed to indicate where in the record the alleged motion was made, and we have not found any reference to it.

▓ In his only argument capable of being addressed by this court, Peerson contends that the process of "death qualifying" jurors violated his constitutional right to an

impartial jury because the process by its nature results in a "conviction prone" jury. This argument has already been raised, thoroughly discussed, and rejected in *State v. Hughes*, 106 Wn.2d 176, 185-88, 721 P.2d 902 (1986). *See also Jeffries*, 105 Wn.2d at 411-12; *State v. Rupe*, 101 Wn.2d 664, 696-97, 683 P.2d 571 (1984), *cert. denied*, 486 U.S. 1061 (1988). For the reasons given by our Supreme Court in those cases, we also reject Peerson's argument that the death qualification process is unconstitutional.

The judgment is affirmed.

BAKER and KENNEDY, JJ., concur.

Review denied at 118 Wn.2d 1012 (1992).