IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of W.J.E., | No. 83889-0-I |
| Minor Child. | DIVISION ONE |
| | UNPUBLISHED OPINION |

COBURN, J. — K.E., the mother of W.J.E., appeals an order terminating her parental rights. K.E. argues that her right to appointed counsel under state law and the federal Indian Child Welfare Act (ICWA) was violated because she was not assigned new counsel for just over one month following the withdrawal of her first counsel. K.E. also claims that the Department of Children, Youth, and Families failed to provide active efforts to reunite the family, as required by ICWA and its Washington state counterpart (WICWA). K.E. fails to show that the period without counsel was a manifest constitutional error resulting in actual prejudice. The record reflects that the trial court did not err in finding that the Department provided active efforts to assist K.E. in overcoming barriers to prevent the breakup of the family. We affirm.

FACTS

The Department removed W.J.E. from K.E.'s care in June 2018 after a neighbor called 911 after observing W.J.E.'s younger sibling jump out of a third story window.

K.E. and her partner had locked the child into the room while K.E. attempted to detox from alcohol abuse. The Department was also concerned about K.E.'s ability to protect W.J.E. from the younger sibling, after a pediatrician reported bruising and scratching on W.J.E.'s body attributed to the sibling. At the advent of the case and until October 2021, both parties denied being members of or eligible for membership in an Indian tribe and neither provided information regarding Native ancestry in a federally recognized tribe. The court repeatedly found that there was no reason to know that W.J.E. was an Indian child as defined by RCW 13.38.040 and 25 U.S.C. § 1903(4).

The trial court granted a default order of dependency as to K.E. in July 2019. The trial court ordered K.E. to participate in several services: random urinalysis (UA) screenings for drugs and alcohol, a drug and alcohol evaluation, a psychological evaluation with a parenting component, individual mental health counseling, and evidence-based in-home services when the child's return home appeared imminent. K.E. was also permitted supervised visitation with W.J.E. twice per week.

At the interim review hearing in March 2020, the court maintained the dependency and found that the Department made reasonable efforts to provide services to the family and eliminate the need for out-of-home placement of the child. The court found the mother had visited the child on a regular basis, had been in some contact with the social worker by phone, and had provided the social worker with her email in accord with a previous court order.

At review hearings in August 2020, January 2021 and June 2021, the reviewing courts continued to maintain the dependency and find that the Department "made reasonable efforts to provide services to the family and eliminate the need for out-of-

2

home placement of the child." As apparent from the court order form, the courts did not find the mother's "homelessness or lack of suitable housing is a significant factor delaying permanency for the child by preventing the return of the child to the home of the child's parent." Presumably, that is why the courts did not order the Department to "provide housing assistance," which was an option on the form.

As a result of K.E.'s lack of engagement in services, the Department filed a petition for termination of parental rights in May 2021. The Department listed the parental deficiencies "identified at the time that dependency was established and at subsequent dependency review hearings, and/or permanency planning hearings" to include:

- Ongoing risk of harm due to mental health issues
- Unresolved mental health issues rendering the parent unable to safely parent
- Untreated substance use resulting in ongoing risk [sic] child neglect
- Lack of understanding of child's developmental needs
- Instability of housing and other resources due to mental health and drug issues
- Other child not in her care

K.E.'s counsel moved to withdraw citing a breakdown in communication. Though given notice of the August 26 hearing, K.E. did not appear. The court granted the motion. The next previously scheduled hearing was four days later on August 30th.

At this fact-finding hearing, W.J.E.'s father did not appear and K.E. appeared late by telephone during the testimony of social worker Katie Collins. The court granted the Department's motion to continue the portion of the hearing as to K.E. The only ruling entered at the hearing related to the father.[1] The court continued K.E.'s preliminary

---

[1] The court struck the father's trial date, entered an order of default as to the father, and terminated his parental rights.

hearing to September 20 "in order for the mother to screen for new counsel." The mother disconnected from the call before the court could provide information on how to screen for "a new public defender." Collins reported to the court that "she would make best efforts to reach out to [K.E.] in order to provide her with the information to screen for a new attorney."

Following the August 30 hearing, K.E. claimed Native ancestry and alleged that her deceased father was affiliated with the federally recognized Shoalwater Bay Tribe, along with claims of membership in several tribes that were not federally recognized.[2] The issue was presented at the September 20 hearing, but ruling was reserved because K.E. was unrepresented at that time.

The court continued the hearing to October 6 because K.E. represented that she was in communication with the Department of Public Defense to screen for new counsel. The court made no other rulings.

On October 6, K.E. appeared with counsel and the parties submitted a stipulated order continuing pretrial conference to November 12 and striking the trial date of October 18. Though counsel represented K.E. at all hearings moving forward, she did not file her notice of appearance with the court until January 27, 2022.

On October 20, the Department submitted an ICWA Notice to the Bureau of Indian Affairs (BIA) and the Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation.

At a review hearing in December 2021, the court changed the child's Indian

---

[2] Social worker Katie Collins submitted an affidavit stating that she had been in contact with four family relatives of K.E. who all denied Native ancestry and stated the family is "Irish on both sides. We are Irish as far back as I can remember."

status, finding that there is reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4). The court also found that the Department "made active efforts by actively working with the parent . . . to engage them in remedial services and rehabilitative programs to prevent the breakup of the Indian family beyond simply providing referrals to such services, but those efforts have been unsuccessful." The court, again, did not find the mother's homelessness or lack of suitable housing as a significant factor delaying permanency for the child by preventing the return of the child to the mother's home. The court did not order the Department to provide housing assistance.

The termination proceeded to trial on February 14, 2022. K.E., while represented by counsel, maintained that her father was born on an Indian reservation in Oregon and her grandfather was an "Eskimo" born in Alaska. The Department informed the court that the BIA was unable to find tribal affiliation with any federally recognized tribe in Alaska and that the Shoalwater Bay Tribe was unable to make a determination as to W.J.E.'s eligibility or ineligibility for membership based on the information provided by K.E. The BIA had directed the Department to inquire with specific tribes. The Department informed the court it was prepared to proceed under the assumption that W.J.E. may be an Indian child and that the Department must meet WICWA and ICWA.

Over the course of the five-day trial, K.E. appeared in person and by Zoom sporadically, but was largely absent from the proceedings. K.E. also failed to make herself available to testify at trial, resulting in a finding that the court was permitted as the fact finder to draw an adverse inference from her non-appearance.

Following trial, the trial court issued written findings of fact crediting the testimony

of ICWA qualified expert witness, Richard England, who testified that in his opinion the Department made active efforts. The court further found that the Department's active efforts included "(a) sending [K.E.] by mail and email multiple service letters which clearly and plainly explained how to access the court-ordered services, listed the locations and contact information of service providers, provided court dates and attorney contact information, and provided contact information for the social worker" and "(b) on multiple occasions trying to contact [K.E.] in person where she said she lived in order to connect her with services and scheduled visitation." The court also found that the Department had "attempted to identify and remove any barriers preventing [K.E.] from engaging in services" but "[K.E.] refused or ignored these orders." The court ultimately found that "[K.E.] remains currently unfit to parent [W.J.E.]. She has been provided every opportunity to be successful; however, she has not remedied any of her parental deficiencies and has voluntarily absented herself from [W.J.E.]'s life, choosing not to visit him for the past eight months and to not engage in services or with the Department's social workers." The trial court ordered the termination of K.E.'s parental rights finding that the Department engaged in active efforts as required by ICWA and WICWA.

K.E. appeals.

## DISCUSSION

### Right to Counsel

K.E. argues for the first time on appeal that her right to counsel under ICWA and WICWA was violated where she was without representation for a period between the withdrawal of her original counsel in late August 2021 and the appointment of new

counsel in early October 2021.

Generally, we will not consider issues raised for the first time on appeal. RAP 2.5(a). However, a party may raise for the first time on appeal a "manifest error affecting a constitutional right." RAP 2.5(a); In re Welfare of A.W., 182 Wn.2d 689, 700 n.10, 344 P.3d 1186 (2015). The challenged error must be "truly of constitutional dimension." Id. (citing State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). "An error is manifest if there is actual prejudice . . . There is actual prejudice if the asserted error had practical effect on the trial of the case." A.W., 182 Wn.2d at 700 n.10. The focus of the actual prejudice standard "must be on whether the error is so obvious on the record that the error warrants appellate review." O'Hara, 167 Wn.2d at 99-100. In determining whether the error was identifiable, the record must be sufficient to determine the merits of the claim. Id. at 99 (citing State v. Kirkman, 159 Wn.2d 918, 935, 980 P.2d 1257 (2007)).

Parents in termination proceedings have "a right to be represented by an attorney in all proceedings." RCW 13.34.090(1). An indigent parent has the right to have counsel appointed by the court "at all stages of a proceeding in which a child is alleged to be dependent." RCW 13.34.090(2). State statute also grants the right to court-appointed counsel for indigent parents of an Indian child, as defined by RCW 13.38.040(7). RCW 13.38.110. This right mirrors the federal right to court-appointed counsel granted by ICWA. 25 U.S.C. § 1912(b).

Because K.E. did not raise a violation of the statutory right below, she has waived that claim. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We next consider if K.E. properly raised a manifest constitutional

error.

Washington state courts have "long recognized parents' fundamental liberty interests in the right to parent their children, which compels a constitutional due process right to court-appointed counsel for all parents in dependency and termination proceedings." In re Dependency of S.K.-P., 200 Wn. App. 86, 97, 401 P.3d 442 (2017). This court has previously held that the statutory right under RCW 13.34.090(2) is derived from the due process guaranties of article 1, § 3 of the Washington state constitution and the Fourteenth Amendment of the United States constitution. In re Dependency of G.G., 185 Wn. App. 813, 826, 344 P.3d 234 (2015).[3]

However, K.E. not only raised a constitutional argument for the first time in her reply brief, she contends she need not show prejudice because the denial of counsel was a structural defect requiring reversal. First, the doctrine of structural error is strictly limited to criminal trials. In re Detention of Reyes, 184 Wn.2d 340, 346, 358 P.3d 394 (2015). Second, a reviewing court need not address issues of constitutional magnitude first raised in a reply brief.[4] Mead School Dist. 354 v. Mead Educ. Ass'n, 85 Wn.2d 278, 534 P.2d 561 (1975); State v. Peerson, 62 Wn. App. 755, 778, 816 P.2d 43 (1991).

K.E. waived the statutory issue by not raising it below and failed to establish a

---

[3] The Washington Supreme Court recognizes that the United States Supreme Court has held that there is no federal constitutional right to counsel for indigent parents in dependency and termination proceedings. In re Dependency of M.S.R., 174 Wn.2d 1, 14, 271 P.3d 234 (2012) (citing Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 31-32, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)). The right to counsel in termination proceedings, by contrast, is left to the states. In re Welfare of J.M., 130 Wn. App. 912, 921, 125 P.3d 245 (2005) (citing Lassiter, 452 U.S. at 33-34)). Following Lassiter, our state Supreme Court has continued to recognize the fundamental liberty interest at stake in dependency and termination cases. King v. King, 162 Wn.2d 378, 394, 174 P.3d 659 (2007).

[4] Even if K.E. had raised this constitutional argument in her opening brief, she does not establish that the roughly 40-day period in which K.E. was unrepresented resulted in actual prejudice required to establish a manifest constitutional error. A.W., 182 Wn.2d at 700 n.10.

manifest constitutional error on appeal.

Active Efforts

K.E. next contends that the trial court erred in finding that the Department made "active efforts" to reunite K.E. with W.J.E., presumed to be an Indian child in this proceeding. K.E. assigns error to several of the trial court's findings of fact, however largely fails to support those assignments with argument. Where a party assigns error to a finding but does not present argument on the claimed assignment in its opening brief, that assignment of error is waived. Cowiche Canyon, 118 Wn.2d at 809.

K.E.'s argument is limited to the Department's efforts in addressing K.E.'s housing instability and providing a working cell phone. Though K.E. does not specifically identify the particular finding of fact challenged in the argument section of her opening brief, it appears the relevant challenged findings are that "the Department expressly and understandably offered or provided all necessary services reasonably available and capable of correcting the parental deficiencies within the foreseeable future" and that the "Department attempted to identify and remove any barriers preventing [K.E.] from engaging in services." Other than the court's related conclusions that the Department engaged in active efforts, K.E. has largely waived challenges to specific factual findings by the court.

The issue of "whether the Department has satisfied the 'active efforts' requirement is a mixed question of law and fact." In re Dependency of G.J.A., 197 Wn.2d 868, 887, 289 P.3d 631 (2021) (quoting In re Dependency of A.L.K., 196 Wn.2d 686, 697, 478 P.3d 63 (2020)). This court reviews the trial court's findings of fact for substantial evidence, but reviews the legal question of whether the Department made

active efforts in compliance with ICWA and WICWA de novo. Id.

ICWA requires, in relevant part, that "any party seeking to effect a termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). ICWA defines "active efforts" as

> affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case . . . .

25 C.F.R. § 23.2.

WICWA similarly requires the Department to make "a showing to the court that the department or supervising agency social workers actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs ordered by the court or identified in the department or supervising agency's individual service and safety plan beyond simply providing referrals to such services." RCW 13.38.040(1)(a)(iii). The Department's actions are required to be thorough to "help the parents overcome barriers, including actively assisting the parents in obtaining such services." G.J.A., 197 Wn.2d at 892. The Washington State Supreme Court has held that the "Department cannot simply provide a referral and leave the parent to engage with providers and complete services on their own." Id. at 891-92.

10

The regulations provide several examples of actions constituting "active efforts," including "identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services" and "identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents . . . in utilizing and accessing those resources." 25 C.F.R. § 23.2(2), (8). "A parent's lack of engagement is relevant only insofar as the Department's burden to prove its efforts were unsuccessful. It does not excuse the Department from providing active efforts in the first place." G.J.A., 197 Wn.2d at 906.

"Active efforts" must be specifically "tailored to the facts and circumstances of the case," and the Department must act diligently to address a parent's particular needs. Id. at 892. The "active efforts" requirement is distinct from the "reasonable efforts" requirement in non-Indian child custody cases because it requires both a higher level of engagement from the Department and culturally appropriate services. Id. at 875. Both K.E. and W.J.E.'s father submitted in July 2017 that neither of them was of Indian ancestry. It was not until September 2021, four months after the Department filed its petition for termination, that the Department first learned that K.E. was claiming W.J.E. was an Indian child.[5] Thus, it is during the period after the Department had reason to believe W.J.E. was an Indian child that it was required to make active efforts.

K.E. asserts that the Department did not assist K.E. with housing, whereas the Department justified not being able to place W.J.E. with K.E. while she was unhoused and living in a tent by the river. K.E. argues that there is no evidence that the

---

[5] The Department, having elected to accept the burden of satisfying ICWA and WICWA at trial, does not argue on appeal that there is not a reason to believe W.J.E. is an Indian child.

Department ever referred K.E. to a single shelter, offered to help her get an apartment or pay the first month's rent.

The Department concedes that K.E. experienced housing instability earlier in the dependency matter, but argues that she had relocated to an apartment in Normandy Park. The record is unclear as to when K.E. obtained the apartment in Normandy Park, but social worker Jay Luna was assigned to her case between March 2019 and December 2020 and testified that K.E. obtained an apartment in Normandy Park and stated that she was going to be receiving services from a nearby clinic. Luna testified that K.E. even invited him to her home and he conducted home visits.

K.E.'s case was transferred to Collins in April of 2021. From April through early September 2021, the Department had no reason to believe K.E. was unhoused. The record reflects that the Department largely communicated with K.E. via phone and email over the course of the dependency, including during the trial. When Collins was first assigned to the case in April 2021 she reached out to K.E. by email and phone. She spoke with K.E. two or three times in May and June. Collins offered to meet in person, but K.E. declined saying she preferred to speak by phone. When Collins spoke with K.E. on the phone, Collins tried to explain that she could make referrals for her drug and alcohol evaluations, offered to come to K.E.'s residence to help her set up the initial evaluations, and offered to drive her to any of the appointments. Collins testified that K.E. "wouldn't allow [Collins] to finish [her] sentences" on the phone when Collins attempted to explain how to access the services or offer to help K.E. access them. K.E. responded that she had already completed several parenting classes, several months of UAs, as well as drug and alcohol evaluations. Collins also attempted to discuss barriers

12

preventing K.E. from complying with court orders and accessing services, but K.E. did not identify any.

Collins testified at trial that K.E. could reach out to Collins by "text, email, in person, any method." However, contact with K.E. became very sporadic after June 2021. Collins texted K.E. in late June through her fiancé's phone. K.E. told Collins she was going out of town and would be back at some point, but after that Collins was rarely able to communicate with K.E. for about eight months.

Collins did continue to reach out to K.E. despite this. She emailed K.E. on a weekly basis, offering to meet with K.E. in person, offering help scheduling appointments, and even rides to and from appointments. Collins also mailed service letters on a monthly basis to K.E., which K.E. had previously confirmed receiving. These letters included information about the services but also included offers by Collins to assist K.E. in setting up required evaluations as well as rides to service appointments. The service letters from May through September 2021 were mailed to the Normandy Park address. Collins reached out to K.E. several times by email, telling her that Collins could "order [K.E.] a cellphone to assist with any communication barriers or to assist in scheduling visits or appointments for her court-ordered services" but K.E. did not respond.

In November 2021, K.E. left a voicemail over a weekend that she was temporarily staying at an inn in SeaTac or Tukwila, left the phone number and asked Collins to call her back. When Collins called the inn the following Monday, she could no longer reach K.E.

The December 2021 and January 2022 monthly service letters were mailed to K.E. at a Seattle address, suggesting that K.E. was capable of and did update the Department with new addresses when she moved. The second address also is consistent with Collins' testimony that she also attempted to reach K.E. in person at two different addresses on four occasions between August 2021 and February 2022. No one answered the door and K.E. did not answer the phone while Collins was at the address. Collins left her business card and also looked around to see if there was a neighbor who could confirm K.E.'s whereabouts.

In the last few weeks before trial in February 2022, K.E. had text messaged Collins back via her fiance's cellphone. K.E. had told Collins that she was moving, but at the time of trial Collins did not know where K.E. was currently residing.

By the time the Department knew there was reason to believe W.J.E. was an Indian child in September 2021, K.E. already had an apartment in Normandy Park. And though K.E. became unresponsive around June 2021, she still managed to update the Department that she was temporarily staying in an inn and later a new Seattle address. She never conveyed to the Department that she needed help finding housing and never suggested that an instability in housing was a reason she could not complete her services. And when K.E. was not responsive, Collins emailed K.E. offering to get her a cell phone and even tried to physically reach her by visiting her residences on multiple occasions. Nothing from those visits dispelled the belief that K.E. had stable housing.

Notably, K.E. appeared with her attorney at a review hearing in December 2021 and the reviewing court did not find that the mother's homelessness or lack of suitable housing was a significant factor delaying permanency for the child by preventing the

return of the child to the home of the mother. The court did not order the Department to provide housing assistance. K.E. does not cite to anything in the record whereby K.E. conveyed to the court at any of the review hearings that she continued to suffer from housing instability once she obtained an apartment in Normandy Park.

K.E. also faults the Department for only offering a cell phone and not actually providing one. However, between April and June 2021, during a time when K.E. denied Native ancestry, the Department could communicate with K.E. by phone, text message, and email. In September 2021, when the Department had reason to believe W.J.E. was an Indian child, K.E. had already stopped responding to the Department, but Collins continued to send weekly emails, monthly service letters and, most importantly, she tried to track K.E. down in person by physically going to her residences four times.

In the last few weeks before trial in February 2022, K.E. had text messaged Collins back via her fiancé's cellphone. Collins ordered a tablet so that K.E. could participate in trial remotely and offered to bring the device to her. K.E. declined saying she would attend the trial in person. Despite this, Collins tried to bring the device to K.E. at her last known address just in case. On the first day of trial, K.E. appeared in person, then decided to appear remotely. K.E. was largely absent from trial.

K.E.'s voluntarily absenting herself from trial after rejecting the Department's offer to provide a tablet so she could appear remotely is similar to K.E.'s actions throughout the dependency. Every time the Department offered assistance, K.E. either denied needing it, rejected it or failed to respond. The Department did more than just provide a list of resources. The record establishes that the Department regularly attempted to engage with K.E. via phone, text message, email, and in person. The Department

15

offered to assist K.E. in setting up her evaluations, drive her to appointments, and come to her home. When K.E. became more unresponsive, the Department continued to reach out weekly, offered by email to get her a cell phone, and tried to contact her at her residences at least four times. The Department specifically asked K.E. what barriers she had that prevented her from completing her services and K.E. denied having any barriers. At trial, it was undisputed that K.E. did not complete all her required court-ordered services and that she had not visited W.J.E. since June 2021.

Under the facts and circumstances of this case, we conclude that the Department engaged in active efforts in compliance with ICWA and WICWA.

We affirm.

_Cohen, J._

WE CONCUR:

_Chung, J._                     _Hazelrigg, A.C.J._

16