FILED
COURT OF APPEALS
DIVISION II

2014 AUG -5 AM 10: 37

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 40962-3-II |
| Respondent, | |
| v. | |
| ADRIAN CONTRERAS-REBOLLAR, | |
| Appellant | |
| IN RE PERSONAL RESTRAINT PETITION OF | Consolidated with No. 41672-7-II |
| ADRIAN CONTRERAS-REBOLLAR, | UNPUBLISHED OPINION |
| Petitioner. | |

HUNT, J. — In this supplemental personal restraint petition (PRP), on remand from the Supreme Court, Adrian Contreras-Rebollar challenges his jury convictions for two counts of first degree assault.[1] He argues that (1) the trial court erred in admitting statements he made to the arresting officer, (2) the State improperly commented on his right to remain silent, (3) he received ineffective assistance when counsel failed to propose a jury instruction addressing his statements to the arresting officer, (4) the State engaged in prosecutorial misconduct, and (5) cumulative error deprived him of his right to a fair trial. We deny Contreras-Rebollar's supplemental PRP.

---

[1] Contreras-Rebollar also pled guilty to one count of second degree unlawful possession of a firearm, which conviction he does not challenge here.

## I. FACTS

We set out the background facts in our first, unpublished decision in this case, excerpts of which we provide here:

> [T]he evening [of April 11, 2006], Contreras[-Rebollar], [Nicholas] Solis, [Regina] Hernandez, and [Ahria] Kelly left their friend's house and went to a place described as "Wolfie's alley," so Solis could pick up a vehicle. Report of Proceedings (RP) (Jan. 23, 2007) at 254. Contreras[-Rebollar] and Hernandez left Wolfie's alley to go drive around; Solis and Kelly followed in the car that Solis had just retrieved. Hernandez alleged that Contreras[-Rebollar] flagged Solis to stop, got out of his vehicle, and argued with Solis about a "sack of dope" and a Palm Pilot. RP (Jan. 23, 2007) at 259. According to Hernandez, Contreras[-Rebollar] returned to his vehicle, said, "[T]his mother f[*]cker is getting on my nerves; I'm going to do him in[,]" and retrieved a gun from the backseat of the car. RP (Jan. 23, 2007) at 261. After going back to Wolfie's alley, Contreras and Hernandez subsequently drove to Yessica Rosas's house. [Hernandez later claimed that, during their second visit to Wolfie's alley, Solis, while wearing a bandana over his face, pointed a gun at Contreras-Rebollar who responded by firing shots in Solis's direction].
>
> [. . .]Rosas and Hernandez were talking in Rosas's bedroom when Contreras[-Rebollar] went outside to his car. Contreras[-Rebollar] returned wearing dark clothes and sunglasses, carrying a gun. Rosas testified that Contreras[-Rebollar] appeared nervous and looked like he was wearing a disguise. Rosas's father, Jose Rosas, heard people talking and he asked Hernandez and Contreras[-Rebollar] to leave. Jose testified that he watched Hernandez and Contreras[-Rebollar] drive away before returning to bed.
>
> Contreras[-Rebollar] sat in the driver's seat and Hernandez sat in the front passenger seat when they left Rosas's house. Hernandez testified that she was looking at CDs [(compact discs)] when she heard Contreras[-Rebollar] say, "[T]here those mother f[*]ckers are." RP (Jan. 23, 2007) at 289. The two were only a short distance from Rosas's house when Contreras[-Rebollar] started shooting at the oncoming vehicle. After Contreras[-Rebollar] finished shooting, Hernandez heard him say, "I just dumped on those fools." RP (Jan. 23, 2007) at 290. Hernandez testified that Contreras[-Rebollar] did not appear afraid; instead, he appeared brave, calm, and cool. Further, Hernandez testified that she had her head down looking at CDs and did not see Solis's vehicle approach; she looked up after Contreras[-Rebollar] started shooting and saw only the taillights of Solis's vehicle. Contreras[-Rebollar], however, relayed a different story at trial. Contreras[-Rebollar] claimed that he saw Solis's vehicle speed up and the headlights turn off. He also claimed to see Solis wearing a bandana and raise the barrel of a gun. Based on this information, Contreras[-Rebollar] believed that Solis was preparing to commit a drive-by shooting. Contreras[-Rebollar] testified

that he feared for his life, reached for his gun, ducked, and fired towards Solis's vehicle.

Solis was driving with Kelly in the passenger seat when Contreras[-Rebollar] shot at them. Kelly testified that he yelled "[d]uck" when he saw the flash of a gun firing from the driver's window of a parked vehicle with no headlights. RP (Jan. 24, 2007) at 501. Solis did not see Contreras[-Rebollar's] vehicle and only remembered seeing gunfire sparks at the time of the shooting. One bullet struck Kelly in the shoulder and at least one bullet struck Solis. As a result of the shooting, Solis is paralyzed from the chest down.

Shortly after the shooting, Kim Say-Ye was returning home when she saw a vehicle parked on the grass in front of her neighbor's house. The vehicle caught her attention because she saw shattered glass and because both the windshield wipers and headlights were on. She thought the driver was drunk and was about to call the police when Officer Timothy Caber showed up.

Caber, who had received the dispatch call for the shooting around 1:00 a.m., briefly spoke to Say-Ye when he arrived at the scene. Caber found the vehicle still running and stopped against landscaping railroad ties on the lawn. He also observed that the windshield wipers and headlights were on. Caber found Solis inside, slumped over; a rifle lay wedged between the driver and passenger seats with the barrel pointing toward the dash.

Edward Robinson, a firearm examiner at the Washington State Patrol Crime Laboratory, determined that the gun was a black powder rifle. Robinson received the rifle without a ram rod and without any wadding, projectiles, and gun powder inside the rifle's chamber or otherwise in a container associated with the rifle. Solis testified that he traded dope for the rifle on the day of the shooting and that he thought the rifle was inoperable.

On April 12, 2006, the police arrested Contreras[-Rebollar] at a Motel 6. The State charged him with two counts of first degree assault, with firearm enhancements, and one count of second degree unlawful possession of a firearm. [. . . ] Contreras pleaded guilty to second degree unlawful possession of a firearm.

[. . .] Both parties focused on credibility throughout the trial [on the two assaults], as many of the witnesses were habitual methamphetamine users who admitted to having a poor memory. On January 23, 2007, Hernandez testified that she did not see the headlights on Solis's vehicle. When the prosecution questioned her, Hernandez acknowledged that her testimony conflicted with a statement she made to police officers shortly after the shooting. However, she claimed that [one of Contreras-Rebollar's counsel] had told her the headlights were off. On direct, Hernandez denied that [defense counsel] told her to say the headlights were off, but on cross-examination she claimed he had. [T]he jury found Contreras[-Rebollar] guilty on both counts of first degree assault and found that he was armed with a firearm during the commission of both crimes.

Consolidated Nos. 40962-3-II and 41672-7-II

*State v. Contreras-Rebollar*, noted at 149 Wn. App. 1001, 2009 WL 448902, at *1-2 (2009) (some alternations in original) (internal footnotes omitted).[2]

## II. PROCEDURE

Contreras-Rebollar has previously filed two direct appeals. We resolved his first appeal in an unpublished opinion in which we affirmed his convictions but remanded for resentencing. *Contreras-Rebollar*, 2009 WL 448902, at *1. Contreras-Rebollar appealed his resentencing— his second appeal. He then filed a PRP, which we consolidated with his pending direct appeal from his resentencing; and we granted his request to supplement his PRP.

In June 2012, in another unpublished opinion, we denied his original PRP as meritless and his supplemental PRP as untimely; and we again remanded for resentencing. *State v. Contreras-Rebollar*, noted at 169 Wn. App. 1001, 2012 WL 2499369 (2012), *review granted*, 173 Wn.2d 563 (2013). Contreras-Rebollar petitioned the Supreme Court for review. The Supreme Court granted the petition in part and remanded to us to consider Contreras-Rebollar's supplemental PRP on the merits.[3] *State v. Contreras-Rebollar*, 177 Wn.2d 563, 564, 303 P.3d 1062 (2013). It is this supplemental PRP that we now consider.

---

[2] We set out additional facts related to Contreras-Rebollar's current arguments in the relevant analysis sections.

[3] The Supreme Court upheld our denial of his original PRP on the merits, remanding only his supplemental PRP. *State v. Contreras-Rebollar*, 177 Wn.2d 563, 564, 303 P.3d 1062 (2013).

Consolidated Nos. 40962-3-II and 41672-7-II

## ANALYSIS

### I. PRP STANDARDS

Generally, to be entitled to relief on collateral review, a petitioner must establish "either that he or she was actually and substantially prejudiced by constitutional error or that his or her trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). Contreras-Rebollar fails to sustain this burden here.

### II. IN-CUSTODY STATEMENTS ADMISSIBLE

Contreras-Rebollar first contends that the trial court erred in admitting his pre-*Miranda*[4] statements to the arresting officer, asserting that they were not spontaneous and voluntary, and instead were coerced.[5] We disagree.[6]

#### A. Standard of Review; *Miranda*

A trial court's CrR 3.5 findings of fact are verities on appeal if substantial evidence supports the findings. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). Evidence

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] Contreras-Rebollar also contends that the trial court erred by failing to enter written findings of fact supporting its CrR 3.5 ruling. Although failure to enter findings of fact and conclusions of law is error, such error is harmless if the trial court's oral findings are sufficient to permit appellate review. *See State v. Johnson*, 75 Wn. App. 692, 698 n.3, 879 P.2d 984 (1994), *review denied*, 126 Wn.2d 1004 (1995). Such is the case here. Accordingly, we do not further address this argument.

[6] Contreras-Rebollar also appears to assert that the trial court erred when it found that he was not in custody when he made these statements. Contreras-Rebollar is incorrect; the trial court specifically found that Contreras-Rebollar *was* in custody when he made the statements. Accordingly, we do not further address this issue.

is substantial when it is sufficient to persuade a fair-minded person of the truth of the stated premise. *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999) (citing *State v. Thetford*, 109 Wn.2d 392, 396, 745 P.2d 496 (1987)). "The legal conclusions flowing from the facts are questions of law," which we review de novo. *State v. Aronhalt*, 99 Wn. App. 302, 307, 994 P.2d 248 (citing *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)), *review denied*, 141 Wn.2d 1012 (2000).

Under the Fifth Amendment of the United States Constitution, "*Miranda* warnings must be given when a suspect endures (1) custodial (2) interrogation (3) by an agent of the State." *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). When these conditions exist, but the state agent fails to advise the defendant of his *Miranda* rights, we presume that "a suspect's statements during custodial interrogation are . . . involuntary" and that we must exclude these statements. *Heritage*, 152 Wn.2d at 214; *State v. Warner*, 125 Wn.2d 876, 888, 889 P.2d 479 (1995). *Miranda* does not, however, "apply to voluntary, spontaneous statements made outside the context of custodial interrogation." *State v. Sadler*, 147 Wn. App. 97, 131, 193 P.3d 1108 (2008) (citing *Miranda*, 384 U.S. 478), *review denied*, 176 Wn.2d 1032 (2013).

Only questions or actions reasonably likely to elicit an incriminating response from the defendant can be characterized as equivalent to interrogation. *State v. Wilson*, 144 Wn. App. 166, 184, 181 P.3d 887 (2008) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)); *State v. Peerson*, 62 Wn. App. 755, 773, 816 P.2d 43 (1991), *review denied*, 118 Wn.2d 1012 (1992). Generally, a statement is not the product of custodial interrogation when it is spontaneous and unsolicited. *State v. Ortiz*, 104 Wn.2d 479, 484, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986). The determination of voluntariness is

made upon the totality of circumstances surrounding the interrogation. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008); *State v. Aten*, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996).

## B. CrR 3.5 Hearing

When the State learned mid-trial that Contreras-Rebollar was planning to testify, it notified Contreras-Rebollar that it intended to cross-examine him about the statements he had made to arresting officer Pierce County Police Detective Brian P. Vold. Defense counsel requested a CrR 3.5 hearing to determine the admissibility of these statements. Vold was the only witness at the CrR 3.5 hearing. The trial court also considered Vold's earlier testimony in the State's case in chief.

Vold testified that he was assisting with the shooting investigation when he learned that Hernandez was at a local Motel 6. Vold and other officers went to the motel hoping to locate the vehicle that had been involved in the shooting. The officers were driving unmarked vehicles and were not in uniform, but Vold was wearing a jacket that had a "flap pulled down identifying [him] as police." 6 Report of Proceedings (RP) at 700. While investigating a vehicle similar to the car involved in the shooting, Vold saw Hernandez walking across "an elevated sidewalk" about 60 feet away. 6 RP at 701. When Hernandez noticed Vold, she appeared "startled," which Vold believed was in response to the police markings on his jacket. 6 RP at 701. Vold "ordered her to continue walking around the elevated sidewalk to the left side of the complex." 6 RP at 701.

As Hernandez continued to walk, Contreras-Rebollar "appeared from the same location [Hernandez] had appeared from." 6 RP at 702. Contreras-Rebollar seemed to be "conceal[ing]"

7

something "against his body"; when he saw Vold, he turned back to the room from which he had emerged and then "reappeared from the same location," appearing empty handed. 6 RP at 703. Vold pointed his firearm at Contreras-Rebollar and ordered him to come downstairs; Contreras-Rebollar complied. Vold "placed" Contreras-Rebollar "on the ground" and handcuffed him. 7 RP at 885. Vold did not advise Contreras-Rebollar of his *Miranda* rights at this point; and none of the officers asked him any questions.

But Contreras-Rebollar spontaneously and "repeatedly ask[ed] [the officers] in various ways what [they] were doing and why [they] were doing it." 7 RP at 886. According to Vold, Contreras-Rebollar asked, "What's going on? Why is this happening?" and "[t]hings to that effect." 7 RP at 886. When Contreras-Rebollar commented that his family had an attorney, Vold told him that it was "[n]ot a problem," that he was "being detained," and that he (Vold) would "respect [Contreras-Rebollar's] wishes." 7 RP at 886.

At the end of the CrR 3.5 hearing, the trial court orally ruled that (1) Contreras-Rebollar was in custody when he made his statements, but (2) *Miranda* did not apply because there was no interrogation.

Here, there was no evidence that any officer attempted to solicit information from Contreras-Rebollar when he spontaneously made his statements. Although the officers clearly intended to take him into custody, that alone was not sufficient to show that their actions were calculated to elicit a response from Contreras-Rebollar. Nor does the record show that his statements were involuntary or "the product of coercion made under psychological duress while being apprehended by an undercover officer." Suppl. PRP at 5. The record supports the trial court's factual findings and legal conclusions that these statements were voluntary, and not a

8

product of a custodial interrogation to which *Miranda* applied. Therefore, we uphold the trial court's admission of Contreras-Rebollar's statements.[7]

### III. COMMENTS ON SILENCE

Contreras-Rebollar next contends that the State improperly commented on his constitutional right to remain silent when it introduced the above statements as substantive evidence of his guilt and repeatedly emphasized his failure to call the police.[8] These claims also fail.

### A. Contreras-Rebollar's Cross-examination

On cross-examination at trial, the State asked Contreras-Rebollar whether he had called the police after the shooting. Without objecting to this question, Contreras-Rebollar testified that he had not called the police; and he confirmed that after the shooting, he took Hernandez to the motel and they had sex.

The State also cross-examined Contreras-Rebollar about what he had told Vold during the arrest:

> When the police arrived and arrested you, when they called you down, what you said to them was not, Hey, I was almost killed. What you said to them was: What's this all about; why are you doing this, why am I being arrested, correct?

---

[7] In his reply, Contreras-Rebollar appears to argue, for the first time, that his statements were inadmissible for evidentiary reasons and because he did not waive his *Miranda* rights. We do not address issues raised for the first time in a responsive brief. RAP 10.3(c); *State v. Clark*, 124 Wn.2d 90, 95-96 n.2, 875 P.2d 613 (1994), *overruled on other grounds by State v. Catlett*, 133 Wn.2d 355, 361, 945 P.2d 700 (1997).

[8] Because these issues present potential manifest constitutional errors, we address them even though Contreras-Rebollar did not object to all of this evidence below. *See* RAP 2.5(a)(3) ("The appellate court *may* refuse to review any claim of error which was not raised in the trial court." (Emphasis added)).

7 RP at 916. Again, Contreras-Rebollar did not object to this question. Instead, he responded that when Vold ordered him to come downstairs, (1) he did not know who the officers were, (2) he asked Vold who they were and what they were doing because they had not identified themselves, and (3) he did not know they were police officers or that he was a suspect until after he was on the ground. In rebuttal, the State recalled Vold, who testified that he had announced directly to Contreras-Rebollar that they were police and that his (Vold's) jacket was clearly marked.

## B. State's Closing Rebuttal Argument

In rebuttal closing, the State argued that in determining whether it had proved the intent element of the charged assaults, the jury could consider what Contreras-Rebollar did after the shooting, including his comments to the police during his arrest:

> The last thing that I want to leave you with is the beyond a reasonable doubt and the assault 2 legal issue.[9] This is not an assault 2, and you know it's not an assault 2 because it does, as I've said all along, the assault 1 is focused on the defendant's intent. It doesn't matter the result; it matters the intent.
>
> That "X" marks the spot defines his intent. That weapon defines his intent. The number of shots he fired defines his intent. The fact that he was sitting there in wait defines his intent. *What he did afterwards defines his intent*: F[**]k off. If you tell the police what happened, just one phone call and the same thing could happen to you, Regina.
>
> Laying [sic] on the ground being cuffed: *What's this all about? What's this all about? All of those things give you a clear picture, an accurate picture of the defendant's mindset*, which is to kill or cause the significant, permanent harm to Mr. Solis, what he actually did, ruthless.

8 RP at 1022-23 (emphasis added).

---

[9] The trial court had instructed the jury on the lesser included offense of second degree assault.

Later, the State mentioned Contreras-Rebollar's failure to call the police after the Solis's alleged initial threat:

> And when you use your common sense, when you analyze the minutia of this case, please step back and look at the big picture. Don't convict because you believe that he's in a gang, that kind of thing. That's not at all what I'm saying, but what I am saying is that these people are not acting reasonably and the defendant doesn't do what most people would do if somebody put a gun at them and called the police, get away, protect their family and themselves in reasonable ways. He goes after him, and that's what he did.

8 RP at 1025.

## C. No Prejudice

A comment on the right to remain silent occurs when evidence of the defendant's silence is used to the State's advantage as either substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). "The use of pre-arrest silence as substantive evidence of guilt implicates the Fifth Amendment and is not merely an evidentiary issue." *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). But the State may use a defendant's prearrest silence to impeach the defendant's credibility if the defendant testifies at trial. *State v. Burke*, 163 Wn.2d 204, 217, 181 P.3d 1 (2008).

Contreras-Rebollar does not persuade us that the State used his failure to call the police as substantive evidence of his guilt. Rather, the record shows that Contreras-Rebollar testified at trial and the State used this evidence on cross-examination to impeach his self-defense claim, which is permissible. *See Burke*, 163 Wn.2d at 217.

In its rebuttal closing argument, however, the State argued that the jury could consider Contreras-Rebollar's failure to tell Vold that he (Contreras-Rebollar) had acted in self-defense as

11

evidence of his "intent,"[10] substantive evidence of Contreras-Rebollar's guilt; this was improper. But this error does not warrant PRP relief unless Contreras-Rebollar also establishes that this comment resulted in actual and substantial prejudice to his case. *Finstad*, 177 Wn.2d at 506. Given the other evidence in this case, he fails to meet this burden. Even if the jury had not heard about Contreras-Rebollar's comments to Vold, there was other evidence of Contreras-Rebollar's intent, including his behavior (as opposed to his comments) following the shooting—leaving the scene, booking into a motel, and having sex with Hernandez, rather than contacting the police— inconsistent with a claim of self-defense. We hold, therefore, that Contreras-Rebollar is not entitled to PRP relief on this ground.

## IV. NO INEFFECTIVE ASSISTANCE OF COUNSEL

Contreras-Rebollar next claims that his trial counsel provided ineffective assistance[11] when he failed to propose a jury instruction based on WPIC[12] 6.41 addressing the weight and credibility of Contreras-Rebollar's in-custody statements.[13] This claim also fails.

---

[10] 8 RP at 1022.

[11] The State argues that Contreras-Rebollar cannot raise this ineffective assistance of counsel claim in his supplemental PRP because he previously raised an ineffective assistance of counsel claim in his direct appeal, which we have already addressed on the merits. Although Contreras-Rebollar previously raised and we addressed an ineffective assistance of counsel claim, *see Contreras-Rebollar*, 2009 WL 448902, at *7-9, his current ineffective assistance of counsel claim is premised on different grounds, the merits of which we have not previously addressed.

[12] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.41, at 196 (3d ed. 2008) (WPIC).

[13] In his reply, Contreras-Rebollar attempts to argue that he also received ineffective assistance of appellate counsel when his appellate counsel failed to raise this argument in his earlier direct appeal. Again, we will not address issues raised for the first time in a responsive brief. *Clark*, 124 Wn.2d at 95-96 n.2.

To establish ineffective assistance of counsel, Contreras-Rebollar must show both deficient performance and resulting prejudice.[14] *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Contreras-Rebollar fails to establish deficient performance or prejudice.

A. No Deficient Performance

CrR 3.5(d)(1), (4) provides:

> If the court rules that the statement is admissible, and it is offered in evidence: (1) the defense may offer evidence or cross-examine the witnesses, with respect to the statement without waiving an objection to the admissibility of the statement; . . . (4) if the defense raises the issue of voluntariness under subsection (1) above, the jury shall be instructed that they may give such weight and credibility to the confession in view of the surrounding circumstances, as they see fit.

Courts normally give a WPIC 6.41 instruction when the defendant challenges the voluntariness of a statement. WPIC 6.41 provides:

> You may give such weight and credibility to any alleged out-of-court statements of the defendant as you see fit, taking into consideration the surrounding circumstances.

WPIC 6.41, at 196. The accompanying note on use of this instruction states:

> This instruction must be given upon request of a defendant when, after a CrR 3.5 hearing, the trial court has ruled that an out of court statement is admissible and the defense has raised the issue whether the out of court statement was voluntary through the evidence offered or cross-examination of witnesses.

WPIC 6.41, at 196.

---

[14] Although this is a PRP, Contreras-Rebollar can establish ineffective assistance of counsel if he meets the prejudice standard that applies to such claims when raised in a direct appeal. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012) ("[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice.").

Contreras-Rebollar does not show that his trial counsel failed to offer this instruction; on the contrary, the record shows that his counsel proposed this instruction.[15] Accordingly, to the extent Contreras-Rebollar predicates his deficient performance claim on failure to propose this instruction, it fails.

## B. No Prejudice

But even if we liberally construe Contreras-Rebollar's challenge as asserting that his counsel should not have acquiesced to the trial court's characterization of his proposed instruction as inapplicabile, Contreras-Rebollar still fails to establish the prejudice prong of the ineffective assistance of counsel test. Despite his evidence about the circumstances under which he made statements to Vold and his explanation at trial about why he did not tell Vold he had acted in self-defense, Contreras-Rebollar offered no evidence suggesting that his statements were involuntary, the necessary trigger for giving WPIC 6.41. Thus, even if defense counsel had challenged the trial court's initial comments about the instruction and insisted that the trial court give it, it is unlikely the trial court would have allowed this instruction. Thus, Contreras-Rebollar cannot show prejudice. His ineffective assistance claim fails.

---

[15] The trial court acknowledged that defense counsel had proposed an instruction based on WPIC 6.41. The State advised the trial court that this instruction was required only "if the defendant contests a 3.5 hearing as to whether or not the statements were voluntary." 7 RP at 948. The trial court responded, "Does that really apply here? The only statements we have is, [']Why are you doing this.[']" 7 RP at 948. After the State asserted that it did not think the instruction was appropriate, defense counsel agreed and withdrew the proposed instruction without further argument.

## V. PROSECUTORIAL MISCONDUCT CLAIMS

Contreras-Rebollar next contends that the State engaged in several instances of prosecutorial misconduct during its cross-examination of him and in closing argument. Contreras-Rebollar fails to show he is entitled to relief on this ground.

### A. Standards

A defendant claiming prosecutorial misconduct must establish the impropriety of the prosecutor's comments and their prejudicial effect. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997), *cert. denied*, 523 U.S. 1007 (1998). If the defendant failed to object to any of the prosecutor's allegedly improper statements at trial, the defendant must show that the prosecutor's comments were "so flagrant and ill-intentioned that [they] cause[d] an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." *Brown*, 132 Wn.2d at 561.

Because this is a PRP, however, Contreras-Rebollar must also satisfy the higher PRP prejudice standards: He must establish "either that he . . . was actually and substantially prejudiced by constitutional error or that his . . . trial suffered from a fundamental defect of a nonconstitutional nature that inherently resulted in a complete miscarriage of justice." *Finstad*, 177 Wn.2d at 506. He fails to meet both standards.

### B. Tailoring

Contreras-Rebollar argues that the State committed prosecutorial misconduct during cross-examination by asking whether he was tailoring his testimony to the evidence. Specifically, he directs us to the following exchange during cross-examination immediately after

Contreras-Rebollar testified about having seen Solis with a gun as he (Contreras-Rebollar) approached Solis's car:

> Q [State].    You're not having your testimony just conform to the evidence, are you?
> A [Contreras-Rebollar].    What do you mean?
> Q.    You didn't just listen to this case and understand that [Solis] had his fingers of his left hand blown off?
> A.    No.
> Q.    Which would mean that there would be blood somewhere probably, if it was touching the gun, correct?
> A.    I guess.
> Q.    You know where the gun was found, with the stock in the back seat, the barrel to the front, and he was leaning on it with his hands in his lap, correct?
> A.    Yes.
> Q.    And my question is:  Aren't you just trying to use the testimony, use the evidence, and create a story?
> A.    No, sir.

7 RP at 922-23.  Our Supreme Court has expressly allowed the State, in response to the defendant's testimony on direct, to cross-examine a testifying defendant about possible tailoring. *State v. Martin*, 171 Wn.2d 521, 535-36, 252 P.3d 872 (2011).  The cross-examination approved in *Martin* is what occurred here; it was not misconduct.

## C. Confrontation

Contreras-Rebollar next argues that the State improperly commented on his right to confront witnesses against him by suggesting in closing argument that Contreras-Rebollar's self-defense claim was a "fabrication," as demonstrated by the inconsistencies between the evidence he offered and other testimony.  Suppl. PRP at 20.  He directs us to the following portions of the State's closing and rebuttal arguments:

> This is not a case of self-defense.  This was an ambush, and to suggest that this is self-defense is misplaced. *Self-defense in this case is nothing more than a creation of the defense after the facts*, after understanding what the State's

16

evidence is, and coming up with some explanation in an attempt to sell to you that the defendant acted in self-defense.

8 RP at 977 (emphasis added).

The same with Yessica [Rosas]. And then what else did Yessica say? And I want to point out something else as well. *The defendant's testimony differs from every single other witness*, people that were in these cars, Yessica, people that were there. *His testimony differs from every other person. And why? Because it's the only way he has a chance of convincing you that it's self-defense.* He's trying to create a doubt. That's the desperation that he has, to hope that you'll be naïve enough to believe that anything he says has to be believed or creates enough of an issue that you won't be able to convict him.

8 RP at 988 (emphasis added).

*So the defendant's story is nothing more, as I've said, than an attempt to convince you after the facts that you should have a doubt in this case.* And fortunate for him, [Solis] had an inoperable weapon between the seats or he has no case at all. That's what he centered his case on, and *he crafted* this "if you ever come back to the East Side, I'll kill you." *He's crafted* the lights being out. *He's crafted*, clearly, the situation that it occurred seeing him down the road in this dark place, seeing the car, seeing the stock of a weapon, and seeing it as he rounds the corner as the driver, and within a split second, let's say less than five seconds, certainly, not only has his passenger identified this person and said who he is, screams several times "there he is", for him to do something, do something, but he's been able to roll down his window, he's been able to retrieve his weapon from under his seat, get it ready, and by the time [Solis] comes all the way to here without shooting, he fires on him. *It didn't happen.* This is an ambush.

8 RP at 993-94 (emphasis added).

With all due respect, reiterating the defendant's crafted self-defense claim, it is nothing more than that. It's just reiterating what the defendant tried to sell you, and you know that the defendant is not credible for several reasons.

8 RP at 1012.

Also, driving with [Hernandez] to two friends' homes, remember, *this is a long, convoluted story that the defendant gives* about where he was and why he was different places. The defendant didn't actually answer the question asked. *He had a story ready to give and he was going to get it all out.* And he told you that there were two friends, two people that could corroborate what he had to say, Eric, and I believe the other person's name was Shawna or something like that.

17

8 RP at 1014-15 (emphasis added). Contreras-Rebollar did not object to any of this argument.

Contreras-Rebollar appears to claim that the State made the above arguments in an attempt to infringe on his right to confront witnesses; this claim, however, is essentially an objection to the State's pointing out that the evidence did not support Contreras-Rebollar's defense. "It is not misconduct . . . for a prosecutor to argue that the evidence does not support the defense theory." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). Thus, this claim also fails.

### D. Prosecutor's Personal Belief

Prosecutors may not "state their personal beliefs about the defendant's guilt or innocence or the credibility of the witnesses." *State v. Dhaliwal*, 150 Wn.2d 559, 577-78, 79 P.3d 432 (2003) (citing *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984)). But such was not the case here.

#### 1. Defendant's credibility

Citing the same portions of the record set out above, Contreras-Rebollar also appears to contend that the State's allegations that Contreras-Rebollar had "fabricat[ed]" his self-defense claim was tantamount to the State's improperly expressing its personal belief about his credibility. Suppl. PRP at 20. This claim fails.

Even presuming, without deciding, that the prosecutor's comments suggested such a personal belief, these closing argument statements were not so flagrant and ill-intentioned that any potential prejudice could not have been cured had Contreras-Rebollar objected. Moreover, (1) taken in context, the jury could have understood these remarks to address whether Contreras-Rebollar's self-defense claim was reasonable in light of all of the evidence; and (2) the trial court

18

had instructed the jury that it was the "sole judge . . . of the credibility of each witness," and we presume that the jury followed the court's instructions. *State v. Foster*, 135 Wn.2d 441, 472, 957 P.2d 712 (1998); State's Response, App. G (Jury Instruction 1). Because Contreras-Rebollar fails to show that an objection and proper instruction would not have cured any potential prejudice or that this argument was prejudicial in light of the other jury instructions, he is not entitled to relief on this ground.

### 2. Witnesses

Contreras-Rebollar further contends that the State engaged in prosecutorial misconduct by vouching for and expressing personal belief about certain witnesses' credibility. Contreras-Rebollar cites the following portions of the record:

> What he did was nothing more than search out [Solis] and shoot him down, gun him down. *And I'm going to tell you right now that the most important witness to this situation is Jose* [(Rosas's father)], *and I'll tell you why.*
> . . .
> Now, the next thing I want to do is, again, move to the evidence which supports that this is an ambush. I'm going to put back in front of you one of several keys to this case, and that's this diagram. . . .
> I'll get right to the most important factor from the beginning, and that is Jose Rosas. What did Jose tell you and *what motivation does Jose have to tell you anything but the truth.*
> Jose told you that at one point he got up and told the defendant to leave and Regina to leave. He watched them get up, he watched them go to the car, and he didn't leave the door frame and go back to his bed. He watched them drive down the street until they took a left turn to leave. Then and only then did he go back to his room, get back in his bed, and try to get back to sleep, and it's only then that he hears gunfire.
> *You will have to say either to be polite, he's mistaken, or that he's lying about that in order to believe the defendant.* Because what did the defendant say? The defendant said he immediately left and as he was rounding this corner, he saw Smiley, [Solis']s car, and Regina started screaming. He reached for his gun, rolled his window down, and started shooting.
> *Somebody is not telling the truth.* It could not have happened both ways. Other issues that are just as important that support Mr. Rosas's statement about what happened, first of all, the time period in which he gave that statement was

right as officers got there he gave a statement to them immediately. So did Yessica. *And Yessica also says that she saw her dad make them leave.*

8 RP at 981-83 (emphasis added).

The physical scene supports everything that was said by Ahria [Kelly], and Ahria is the only one apparently who remembers. Either that or [Solis] is not willing to talk about it for whatever reason. *But Ahria has no motive to say anything other than what happened.* He said in the hospital that he was afraid of what would happen if he told in the 'hood. He was afraid of being a snitch. *But in court, and I apologize for using this language, but I think it's expressive; it's how he represented his motive for talking, he just said: F[\*\*]k it; I'm going just going to tell the truth. And he did.* By all accounts, based on the physical scene, it appears that he's telling the truth.

8 RP at 986 (emphasis added).

Although some of the above comments arguably reflect the prosecutor's personal belief about a witness's credibility, as we have previously discussed, any prejudicial impact of these comments could have been cured by a timely objection from Contreras-Rebollar and curative instruction by the trial court. But Contreras-Rebollar did not object to any of this argument that he now challenges for the first time. Nor does he show that the comments were flagrant and ill-intentioned. Furthermore, again we note that the trial court instructed the jury that it was the sole judge of credibility; and nothing in the record suggests that the jury did not follow this instruction. *Foster*, 135 Wn.2d at 472. Thus, Contreras-Rebollar is not entitled to relief on this ground.

### E. Facts outside the Record

Contreras-Rebollar also appears to assert that several portions of the State's closing argument were not supported by the record.[16] Even if this were the case, again we note that the

---

[16] Specifically, Contreras-Rebollar cites the following portions of the record:

trial court instructed the jury that the State's argument was not evidence and that it (the jury) must disregard any statement or argument not supported by the record. Again, we presume the jury follows the trial court's instructions. *Foster*, 135 Wn.2d at 472. Thus, this claim also fails.

## VI. CUMULATIVE ERROR

Finally, Contreras-Rebollar asserts that cumulative error deprived him of a fair trial. Again, we disagree.

Even if each error standing alone would otherwise be considered harmless, cumulative error may warrant reversal when the errors combined denied the defendant a fair trial. *State v.*

---

> Jose told you that at one point he got up and told the defendant to leave and Regina to leave. He watched them get up, he watched them go to the car, and he didn't leave the door frame and go back to his bed. He watched them drive down the street until they took a left turn to leave. Then and only then did he go back to his room, get back in his bed, and try to get back to sleep, and it's only then that he hears gunfire.

8 RP at 983.

> What other significant value does that reaction and that statement have? *It proves that the defendant is not telling the truth, is not credible on the stand,* because what did he say on the stand under oath? That she brought the issue of Smiley to his attention as they were rounding that corner, that she did that.
>
> And there's another example right there of a big material contrast between what the other person in the car said happened and what the defendant does. *And what does Regina have to lose or gain by telling you anything other than the truth?* What does the defendant have to lose or gain by telling you anything other than the truth.

8 RP at 1017.

> Then, finally, the defense says time is relative. I mean, come on. Jose and Yessica don't have much to add to this case. It's just a few seconds. Well, first of all, that's not their testimony. It wasn't a few seconds, it was minutes. It was, went back to bed, trying to get to bed. It was Jose watching the car and take the turn, then he went to bed, and then, after a period of time, he heard the gunfire.
>
> It was Yessica saying she watched her dad escort them out and watched her dad till he closed the door and then she went and closed her door, got back in bed and was laying there for a period of time before she heard the gunfire.

8 RP at 1021.

21

*Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 US. 1137 (2007). The defendant, however, bears the burden of proving an accumulation of error of such magnitude that retrial is necessary. *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). Contreras-Rebollar fails to carry this burden.

Even presuming, without deciding, that (1) the State improperly used Contreras-Rebollar's statements to the arresting officers as substantive evidence, (2) portions of the State's argument may have suggested personal belief as to Contreras-Rebollar's guilt or some of the witnesses' credibility, and (3) portions of the State's argument were not supported by the record, in light of the other evidence and the jury instructions in this case, Contreras-Rebollar does not show that these errors cumulatively deprived him of a fair trial. Accordingly, he is not entitled to relief on this ground.

We deny this petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Johanson, C.J.

Melnick, J.

22