FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 DEC -3 AM 9: 23

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

    v.

BRIAN J. SMITH,

              Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 76340-7-I

UNPUBLISHED OPINION

FILED: December 3, 2018

DWYER, J. — Brian Smith appeals from a jury's verdict finding him guilty of vehicular homicide and obstructing a law enforcement officer. He asserts that the trial court erred by admitting evidence obtained from a blood draw, that his lawyers provided constitutionally ineffective representation, and that he was harmed when the jury was provided constitutionally deficient instructions on superseding causes. None of his contentions merit appellate relief. We affirm.

I

While driving home on the evening of December 5, 2014, Smith attempted to turn left off of a state highway and collided with Jason Schuylman's motorcycle as it was driving in the opposite direction. The impact from the collision threw Schuylman onto the hood of Smith's SUV. His head struck the windshield. Schuylman was transported to the hospital, where he subsequently died from his injuries. Because Smith's appeal primarily asserts error in the trial court's pretrial

rulings, the facts set forth herein are those established through testimony during those hearings unless explicitly stated otherwise.

Washington State Patrol Trooper Brad Beattie arrived at the collision scene after some of the medical personnel had left to transport Schuylman to the hospital. Other paramedics had begun attending to Smith. Beattie approached Smith and, noticing signs that Smith may have been intoxicated, asked him to perform field sobriety tests. Smith's performance on the tests led Beattie to request that Smith undergo a portable breath test, on which Smith's breath sample read .145. Beattie arrested Smith.

Beattie read Smith his Miranda[1] warnings, handcuffed him, and placed him in the back of his patrol car. Following the warnings, Smith immediately asked when he would be able to speak with an attorney. Beattie informed Smith that he could not put him in contact with an attorney at the scene, that he could do so once they arrived at the jail, and that he would not ask Smith any questions before putting him in contact with an attorney.[2]

Beattie waited approximately half an hour for another trooper to arrive at the scene before leaving with Smith.[3] While waiting, Beattie kept Smith handcuffed in the patrol car, without access to a telephone. Before departing,

---

[1] Miranda v. Arizona, 384 U.S. 436, 88 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] Beattie testified during pretrial hearings that his standard procedure for providing access to an attorney was to allow access at the jail because he lacked the resources necessary to provide access in the field.

[3] Beattie testified at pretrial hearings that while other police officers were at the scene of the collision when he arrested Smith, he was the only officer at the scene from the Washington State Patrol. He further explained that the other officers were members of the Everson Police Department and were not trained to investigate the type of collision that had occurred. Thus, he was instructed via dispatch to wait at the scene until another trooper arrived to take over supervising the scene.

Beattie learned that Schuylman's injuries were serious and that he was being taken into surgery.

Given that Beattie was concerned that the collision might result in a felony charge and that it was department policy to obtain a blood sample in felony cases involving intoxicated driving, Beattie drove Smith to a hospital rather than to the jail. After arriving at the hospital, Beattie obtained a search warrant for Smith's blood. Beattie did not provide Smith with access to an attorney while he was obtaining the warrant because he did not plan to ask Smith any questions and because he was focused on ensuring that he could obtain a blood sample before the alcohol in Smith's blood dissipated.[4]

When Smith was informed that he would undergo a blood draw he stated that he would not allow it. Beattie explained to Smith that he had a search warrant for Smith's blood and tried to give the warrant to Smith to review. Smith said that he did not want to see it. Without prompting, Smith stated that blood draws were against his religion, that he was afraid of needles, and that if they tried to draw his blood he would not allow it. At this time, Beattie uncuffed Smith and allowed him to use the restroom, but did not provide him access to a telephone in order to call an attorney.

Concerned that Smith would physically struggle to prevent the blood draw, hospital staff and Beattie moved Smith to a padded room containing a bed with restraints attached to it. After entering the room, Beattie told Smith to get on the

---

[4] Beattie testified at pretrial hearings that the Washington State Patrol generally tries to obtain a blood sample within two hours of a collision and that over an hour had already passed between Smith's arrest and Beattie and Smith arriving at the hospital.

bed but Smith refused and physically resisted attempts to force him onto the bed and into the restraints. Only after Beattie placed his stun gun on Smith's chest and threatened to use it if he did not get on the bed did Smith comply and allow himself to be restrained.

When the phlebotomist attempted to draw blood, Smith again physically resisted. Even when hospital security officers and troopers attempted to hold Smith down, he tensed up, flailed, and kicked as much as the restraints would allow. Concerned that the needle might break off or stab someone because of Smith's resistance, the phlebotomist concluded that she was not comfortable continuing to try to draw his blood.

After a short break, during which the phlebotomist and Beattie discussed potential next steps with a hospital doctor, Dr. Oleg Ravitsky, it was decided that they would make another attempt. Immediately prior to this attempt, Beattie read Smith the special evidence warnings, including a statement that Smith had the right to seek additional independent testing of his blood. The second attempt, however, proved as futile as the first due to Smith's continued resistance. Again, the phlebotomist decided that she was uncomfortable continuing.

After the second attempt, the phlebotomist told Beattie and Dr. Ravitsky that she was unwilling to try again because of Smith's resistance. Someone suggested sedating Smith as a possible means of enabling the safe completion of the blood draw.[5] By this time, Beattie had been informed that Schuylman had

---

[5] The record is not entirely clear as to who first suggested sedating Smith. Beattie testified at pretrial hearings that it was Dr. Ravitsky who mentioned it during the discussion held after the second blood draw attempt. However, Dr. Ravitsky testified that his medical examiner told him that the decision to sedate Smith had already been made by someone else (although he

died as a result of his injuries. Because he was concerned about obtaining evidence of Smith's blood alcohol content for a potential vehicular homicide case, Beattie agreed to sedation.

After observing the second attempt to complete the blood draw, Dr. Ravitsky believed that Smith was behaving in an unusual manner because drugs or alcohol consumption had induced a psychotic manner. Due to Smith's behavior and because of the risk that Smith may have suffered trauma during the collision, Dr. Ravitsky believed that Smith should be sedated to enable a medical examination to clear him for admittance to jail. Dr. Ravitsky decided that, due to the drug or alcohol induced psychotic manner he had observed, Smith lacked the capacity to consent and that sedation was necessary for Smith's safety and the safety of hospital staff. Dr. Ravitsky believed that sedating Smith was a proper course of action in that it dramatically reduced the risk that Smith would seriously injure himself or others by struggling against the next blood draw attempt.

When Dr. Ravitsky informed Smith that he was going to be sedated, Smith replied that sedation was not possible because he was allergic to the sedative.[6] Smith then claimed that he was allergic to all sedatives. Dr. Ravitsky briefly left the room in order to check Smith's medical records (so as to attempt to verify Smith's claims). While they were waiting, Beattie gave Smith his cell phone to allow him to call an attorney. Beattie did not provide Smith with a telephone

---

did not know by whom). Regardless, Dr. Ravitsky believed that such sedation was necessary and testified during pretrial hearings that he had had the final say on sedating Smith.

[6] The pretrial record is unclear as to which sedative Smith first claimed to be allergic.

number for an attorney and Smith did not attempt to call an attorney but, rather, called his wife.

Dr. Ravitsky's search of Smith's medical records did not verify Smith's claimed allergies to sedatives. Dr. Ravitsky ordered that Smith be given an injection of Haldol, with a secondary of Atvian or Benadryl.[7] Smith physically resisted the administration of the sedative, tensing and kicking at hospital staff who attempted to inject him. Accordingly, Smith was distracted so that the nurse could safely perform the injection.

The sedative made Smith calm and sleepy, but did not render him unconscious. While Smith was sedated, Dr. Ravitsky was able to perform a medical assessment of him and hospital staff successfully performed the blood draw. Smith did not exhibit any negative side effect from the sedative.

Following the execution of the warrant to obtain a sample of Smith's blood, Beattie took Smith to the Whatcom County Jail for booking. Beattie presumed that Smith would be granted access to a telephone to call an attorney as part of the booking process, as he believed that such was the jail's standard procedure. The record, however, does not indicate whether this occurred.

Smith was charged with vehicular homicide and obstructing a law enforcement officer. Smith filed pretrial motions to suppress the evidence of his performance on the field sobriety tests and the result of the blood test, and to preclude testimony regarding various statements Smith had made while at the

---

[7] At the time he gave this order, Dr. Ravitsky had 13 years of experience in administering these sedatives and knew that the potential side effects are usually mild and easily managed and also knew that Smith would be monitored for any side effects.

hospital on the night of the collision. Following extensive pretrial hearings, the trial court ruled that evidence of the result of the blood test and the statements made by Smith while at the hospital were admissible.

At trial, the State's witnesses from pretrial hearings testified in keeping with their pretrial testimony. To explain Smith's behavior in resisting the blood draw, the defense, relying on trial testimony from Smith himself, argued that Smith was terrified of needles.[8] The defense also offered an alternative explanation for the cause of the collision, claiming that the headlight on Schuylman's motorcycle was off when Smith had looked to see if it was safe to turn left, and that this relieved Smith of culpability.[9]

At the close of the evidence, the trial court gave the following jury instructions regarding superseding causes:

> Instruction No. 8
> To constitute vehicular homicide, there must be a causal connection between the death of a human being and the driving of a defendant so that the act done was a proximate cause of the resulting death.
> The term "proximate cause" means a cause which, in a direct sequence, unbroken by any new independent cause, produces the death, and without which the death would not have happened.

---

[8] At trial, Smith testified that he does not "do well with needles," but denied that he had ever stated that he was allergic to all sedatives or that blood draws were against his religion. Smith did not present any other witnesses at trial who possessed firsthand knowledge of the veracity of Smith's statements at the hospital claiming a fear of needles. No other witnesses at trial corroborated Smith's testimony regarding his statements pertaining to religious objections to blood draws and allergies. Similarly, during pretrial hearings, no witness with firsthand knowledge testified to Smith's fear of needles, allergies to sedatives, or religious issues with blood draws. Smith did not testify at the pretrial proceedings.

[9] Smith also argued at trial that problems with the design of the motorcycle's shifting mechanism could have been a superseding cause, but even Smith's own expert witness admitted that he had no reason to believe that the shifting mechanism had anything to do with the collision. The record shows that Smith did not present any evidence tending to show that the shifting mechanism was in any way a cause of the collision. We therefore will not consider this argument further.

There may be more than one proximate cause of a death.

Instruction No. 9

If you are satisfied beyond a reasonable doubt that the driving of the defendant was a proximate cause of the death of another, it is not a defense that the driving of the deceased may also have been a proximate cause of the death.

However, if a proximate cause of the death was a new independent intervening act of the deceased which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's act is superseded by the intervening cause and is not a proximate cause of the death. An intervening cause is an action that actively operates to produce harm to another after the defendant's act has been committed or begun.

However, if in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original act and the defendant's act is a proximate cause. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death falls within the general field of danger which the defendant should have reasonably anticipated.

The wording of these instructions was taken from Washington Pattern Jury Instructions 90.07 and 90.08. 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 90.07, 90.08, at 276, 278 (4th ed. 2016) (WPIC).

Following closing arguments, the jury found Smith guilty of both the crime of vehicular homicide and the crime of obstructing a law enforcement officer. Smith appeals.

II

On appeal, Smith primarily contends that the evidence obtained from the drawing and testing of his blood should have been excluded from trial. This is so, he asserts, because the evidence was obtained in violation of his rights

pursuant to our federal and state constitutions and a court rule regarding the right to counsel in criminal cases. We disagree.

Because Smith challenges only the trial court's legal conclusions, we consider factual findings from the pretrial hearings as verities on appeal. See State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review the challenged conclusions of law de novo. State v. Inman, 2 Wn. App. 2d 281, 290, 409 P.3d 1138, review denied, 190 Wn.2d 1022 (2018).

A

Smith first asserts that evidence obtained from the blood draw should have been excluded because the manner in which the police executed the warrant to obtain his blood violated his right to due process pursuant to the Fourteenth Amendment and his right not to be subject to unreasonable searches and seizures pursuant to the Fourth Amendment of the United States Constitution. Specifically, Smith objects to the conduct of the police in restraining him to a hospital bed and sedating him in order to conduct the blood draw, without his consent and without a warrant explicitly authorizing the use of sedatives. In response, the State asserts that such measures were permissible, particularly because they became necessary only after Smith physically resisted the judicially authorized blood draw. The State has the better argument.

Before the Fourth Amendment to the United States Constitution was incorporated via the Fourteenth Amendment to apply to the states, the United States Supreme Court analyzed state police searches and seizures intruding into a defendant's body solely through the due process clause of the Fourteenth

Amendment. See Rochin v. California, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952). In Rochin, the Court held that evidence obtained as a result of police unlawfully breaking into a suspect's house, forcibly attempting to open and remove items from the suspect's mouth, and ultimately forcibly extracting the contents of the suspect's stomach, was inadmissible. 342 U.S. at 167, 174. The Court held that such behavior, by agents of government, shocked the conscience and were "methods too close to the rack and the screw to permit of constitutional differentiation." Rochin, 342 U.S. at 172.

Although Rochin has never been overruled, following the incorporation of the Fourth Amendment to apply to the states, the Supreme Court has shifted its analysis of state police conduct during searches and seizures to a reasonableness analysis under the Fourth Amendment. County of Sacramento v. Lewis, 523 U.S. 833, 849 n.9, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1988) (acknowledging that if Rochin arose subsequent to incorporation it "would be treated under the Fourth Amendment [analysis], albeit with the same result").[10] This Fourth Amendment search or seizure reasonableness analysis encompasses issues pertaining to the right to refuse medical treatment, procedures, or medication, even though in other contexts the right to refuse medical treatment is typically analyzed under the Fourteenth Amendment's due

---

[10] Occasionally, a court has relied upon the Rochin analysis when confronted with a case in which the police had searched inside a suspect's body, but Rochin "cannot be said to be flourishing as an authority in that there has not been any tendency to apply it in any general way." Yanez v. Romero, 619 F.2d 851, 856 (10th Cir. 1980). Cf. Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978), overruled by Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (holding by Second Circuit based on a Rochin analysis overruled by Supreme Court using Fourth Amendment reasonableness analysis).

process clause. See e.g., Winston v. Lee, 470 U.S. 753, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985) (considering whether it was reasonable for Fourth Amendment purposes to compel a defendant to undergo surgery to remove a bullet); United States v. Husband, 226 F.3d 626 (7th Cir. 2000) (considering whether it was reasonable for Fourth Amendment purposes to administer an intravenous anesthetic to sedate a resisting suspect to retrieve contraband believed to be hidden in the suspect's mouth).

"[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Schmerber v. California, 384 U.S. 757, 768, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). In Schmerber, the Court considered whether, in a drunk driving case, evidence obtained from a blood draw administered at a hospital without a warrant, and without the suspect's consent, violated the suspect's Fourth Amendment rights. 384 U.S. at 758-59, 768-70. In affirming the admissibility of the evidence, the Schmerber Court explained that "the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness." 384 U.S. at 768. The Court held that, on the record therein, there was probable cause to believe that the blood draw would effectively produce evidence of a crime.[11] The Court

---

[11] The Schmerber Court specifically recognized that blood tests are "a highly effective means of determining the degree to which a person is under the influence of alcohol." 384 U.S. at 771.

also reasoned that the blood draw was a safe and common procedure performed by medical personnel at a hospital, there was insufficient time to obtain a warrant, and, thus, a compelled, warrantless, blood draw constituted a reasonable search and seizure under the Fourth Amendment. Schmerber, 384 U.S. at 770-71. The Court explicitly restricted its ruling to the facts before it and noted that different circumstances, particularly if the suspect had requested alternative testing on the grounds of "fear, concern for health, or religious scruple," might require a different analysis. Schmerber, 384 U.S. at 771.

In Winston v. Lee, 470 U.S. at 761-62, the Supreme Court identified three factors considered in Schmerber that should be considered, in addition to a finding of probable cause, when determining the reasonableness of any search or seizure involving a compelled bodily intrusion. Therein, the Court weighed the "extent to which the procedure may threaten the safety or health of the individual" and the "extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" against "the community's interest in fairly and accurately determining guilt or innocence." Winston, 470 U.S. at 761-62. Emphasizing, as it had in Schmerber, that a reasonableness analysis required a case-by-case approach, the Court in Winston held that the record before it showed that the State's requested compelled surgery was unreasonable. 470 U.S. at 766. The Court explained that the State had failed to demonstrate a compelling need for the evidence the surgery would have provided, and that the collection of merely useful, but not necessary, evidence was insufficient to overcome the uncertain medical risks of the surgery and the severe intrusions on

the defendant's privacy interests that such surgery would entail. Winston, 470 U.S. at 766.

In analyzing the Winston factors, we first note that the police herein sought a blood sample pursuant to a valid warrant. Second, as in Schmerber, the risk to Smith's health from participating in the blood draw was very low because a blood draw is a safe and common procedure.[12] Similarly, the pretrial record is clear that the risk of harm to Smith's health from the use of the sedative was also very low.[13]

---

[12] Smith asserts that he falls within the special category of persons who object to the administration of a blood draw out of "fear, concern for health, or religious scruple." See Schmerber, 385 U.S. at 771. He contends that his fear of needles requires us to view the blood draw differently than the Court did in Schmerber. However, the pretrial record provides no support for his assertion of fear. The trial court did not find that Smith had a fear of needles, nor could it have so found from the evidence presented. No witness with firsthand knowledge of the fact testified during pretrial hearings that Smith had a fear of needles. Instead, the witnesses testified to only their firsthand knowledge of his utterances to that effect. Indeed, Beattie was explicitly asked during pretrial hearings whether he knew what Smith's fears were on the night of the collision and he answered that he did not know.

Citing to civil cases, Smith contends that the combination of the trial court's finding that Smith made statements at the hospital claiming to be afraid of needles and the trial court's absence of a finding that Smith's statements were not credible requires us to conclude that the trial judge credited Smith's claim of fear. However, the trial judge had to make a finding identifying statements Smith made at the hospital so that he could determine whether such statements were voluntary or the product of custodial interrogation in order to resolve the issues raised in the pretrial CrR 3.5 motion. The judge made a finding that certain statements were made but made no explicit finding as to their veracity. That the judge found as a fact that Smith uttered a statement about a fear of needles does not indicate that the judge believed the statement was true. Indeed, the context indicates quite strongly that the opposite is true. To be sure, for us to apply Smith's desired reasoning would require us to also conclude that the trial judge credited the truth of Smith's other statements at the hospital, including the statements concerning his religious scruples regarding blood draws and his allergies to all sedatives. Such a conclusion is illogical given that the record clearly shows that Dr. Ravitsky attempted to verify Smith's claimed allergies to all sedatives and that nothing in Smith's medical records supported the claim. It would be patently unreasonable to conclude that the trial judge credited Smith's statement claiming that he was allergic to sedatives when that statement was so clearly discredited soon after it was uttered. Smith failed to present even a scintilla of evidence during pretrial hearings that any of the statements at the hospital were truthful. We therefore decline Smith's invitation to force upon the trial judge a set of factual findings that the judge plainly did not make.

[13] In fact, the trial court found that attempting to execute the warrant without sedating Smith would have risked placing him in greater harm than did sedating him because Smith's struggling may have broken off a needle inside of Smith's arm.

- 13 -

Third, unlike the risk of harm to his health, the harm to Smith's dignitary interests was more substantial because he was forcibly sedated to undergo a medical procedure without his consent. However, the harm was not as severe as that threatened by the police in <u>Husband</u> or <u>Winston</u> because Smith was not sedated to the point of unconsciousness. Additionally, it is pertinent to our analysis that Smith was sedated (thus increasing the otherwise minimal harm to his dignitary interests presented by a routine blood draw) only because of his physical resistance. Smith had the opportunity to avoid sedation by cooperating with the police and hospital staff who were attempting to obtain a blood sample as authorized by a valid judicial warrant, but chose not to do so. It is plain that suspects would be improperly incentivized to resist the execution of warrants if, by doing so, they could force the State to employ more intrusive measures that would then be held to be violations of the suspect's constitutional rights.[14] We therefore conclude that the dignitary harm posed by Smith's forced sedation was substantially mitigated by the fact that Smith himself created the need for such sedation.

Lastly, the community interest in obtaining the evidence garnered by the blood draw was extremely high. Schuylman died from his injuries, making Smith a suspect in a vehicular homicide case. Furthermore, highly relevant evidence

---

[14] This does not mean that there are no limits to the manner in which police officers may execute a warrant. Rather, it simply means that a defendant's resistance may make otherwise unnecessary methods of execution reasonable in certain circumstances. Nothing we state should be understood as disagreeing with the proposition that the execution of a warrant must always be reasonable under the circumstances. <u>State v. Hampton</u>, 114 Wn. App. 486, 494, 60 P.3d 95 (2002).

germane to his guilt or innocence was quickly dissipating as time passed.[15,16] Additionally, because Smith was resisting the execution of the warrant, he threatened society's interest in seeing that judicial warrants are obeyed. We conclude that the very low risks to Smith's health, and the moderate harm to Smith's dignitary interests caused solely by Smith's refusal to cooperate with less invasive procedures, were outweighed by the community's interest in obtaining the evidence resulting from the blood draw and in ensuring compliance with judicial warrants. The administration of a low risk sedative by medical personnel at a hospital, who continuously monitored Smith, was, under the circumstances, a reasonable method of executing the warrant.

## B

Smith next contends that the administration of the sedative in order to conduct the blood draw violated his rights pursuant to article I, section 7 of the state constitution because the police lacked authority of law to sedate him. Smith asserts that a second warrant was required that specifically authorized the execution of the first warrant by use of sedation. We disagree.

---

[15] Smith's assertion that the relatively recent case of Missouri v. McNeely, 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), prohibits us from considering the dissipation of alcohol in Smith's blood when determining the reasonableness of the search and seizure is based on a misreading of McNeely. All McNeely holds is that the dissipation of alcohol in a suspect's blood is not a per se exigency excusing the need for a warrant before drawing blood from a suspect. As the police herein had secured a warrant to obtain Smith's blood, McNeely's holding regarding exigent circumstances is inapplicable.

[16] Smith asserts that because he resisted the blood draw for several hours, there was plenty of time for the police to obtain another warrant authorizing his sedation rather than investing time forcing him to be sedated. According to Smith, this logic renders the decision to forcibly sedate him unnecessary, and, thus, unreasonable. Such an argument presumes that Smith would have complied with a second warrant, but nothing in the record indicates that the existence of a warrant made any difference to Smith's level of resistance. Smith refused to cooperate when informed about the first warrant and nothing in the record supports an assertion that he would have cooperated with a second one.

Article I, section 7 of our constitution states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Our Supreme Court has explained that "[t]he 'authority of law' required by article I, section 7 is satisfied by a valid warrant." York v. Wahkiakum Sch. Dist. No. 200, 163 Wn.2d 297, 306, 178 P.3d 995 (2008). Article I, section 7 prohibits only "unreasonable searches and seizures." State v. Curran, 116 Wn.2d 174, 184, 804 P.2d 558 (1991), abrogated on other grounds by, State v. Berlin, 133 Wn.2d 541, 947 P.2d 700 (1997).

Our Supreme Court has been clear: when a warrant's purpose is to authorize the collection of evidence, "[i]t is not sensible to read the warrant in a way that stops short of obtaining that evidence." State v. Figeroa Martines, 184 Wn.2d 83, 93, 355 P.3d 1111 (2015). Search warrants are "to be tested and interpreted in a commonsense, practical manner." State v. Perrone, 119 Wn.2d 538, 549, 834 P.2d 611 (1992). The reasonable execution of a valid warrant satisfies the authority of law requirement. State v. Hampton, 114 Wn. App. 486, 494, 60 P.3d 95 (2002).

Here, Smith does not contest the validity of the warrant relied upon by the police to obtain a sample of his blood. As previously discussed, the manner of execution of the warrant was reasonable under the circumstances. It is not sensible to read the warrant, issued for the purpose of enabling the police to obtain and test Smith's blood, as prohibiting the reasonable manner of execution under the circumstances that was required in order to obtain the blood sample needed to test Smith's blood alcohol content. See Figeroa Martines, 184 Wn.2d

at 93. Therefore, the warrant provided the necessary authority of law under the circumstances to authorize sedating Smith to enable hospital staff to perform the blood draw.

C

Smith next contends that he was improperly denied his right to counsel pursuant to CrR 3.1. He asserts that by denying his right to counsel, the police deprived him of an advocate before, during, and for several hours after the blood draw, thereby depriving him of any legal advice regarding the right to seek an independent blood test.

CrR 3.1 provides, in pertinent part:

> **(b) Stage of Proceedings.**
> (1) The right to a lawyer shall accrue as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest.
>
> . . . .
> **(c) Explaining the Availability of a Lawyer.**
> . . . .
> (2) At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer.

CrR 3.1 goes "beyond the constitutional requirements of the fifth and sixth amendments to the United States Constitution" by providing a more immediate right to counsel upon arrest. State v. Templeton, 148 Wn.2d 193, 218, 59 P.3d 632 (2002). If there is a violation of the court rule right to counsel, any evidence that was tainted as a result of the violation must be suppressed. State v. Schulze, 116 Wn.2d 154, 162, 804 P.2d 566 (1991).

However, we have previously held that the rule does not "compel police to postpone routine prebooking procedures or the execution of a search warrant when an arrestee expresses the desire to consult an attorney." State v. Mullins, 158 Wn. App. 360, 369, 241 P.3d 456 (2010). Citing approvingly to Mullins, our Supreme Court recently held that a defendant's rights pursuant to CrR 3.1 are not violated when law enforcement's "investigative duties and . . . security measures and policies precluded an earlier meeting with an attorney." State v. Scherf, No. 88906-6, slip op. at 21 (Wash. Nov. 8, 2018) http://www.courts.wa.gov/opinions/pdf/889066.pdf.

Here, Smith requested to speak to an attorney several times between his arrest and booking at the jail. During this time, Beattie was supervising the collision scene, driving Smith to the hospital and to the jail, and attempting to obtain and execute a search warrant for a blood sample. CrR 3.1 did not require Beattie to postpone the completion of his routine duties, including supervising the scene of the collision until another trooper arrived to ensure the safe and effective management of the scene, transporting an arrested suspect by patrol vehicle, and obtaining and executing a valid search warrant. Therefore, there was no CrR 3.1 violation.

Even if there had been a violation of Smith's rights pursuant to CrR 3.1, however, he would still not be entitled to appellate relief. "Because the asserted error is a violation of a court rule (rather than a constitutional violation), it is governed by the harmless error test." State v. Robinson, 153 Wn.2d 689, 697, 107 P.3d 90 (2005). Thus, reversal is appropriate only when, within reasonable

probabilities, "'[if] the error [had] not occurred, the outcome of the [trial] would have been materially affected.'" Robinson, 153 Wn.2d at 697 (first two alterations in original) (internal quotation marks omitted) (quoting Templeton, 148 Wn.2d at 220).

When evidence is obtained through a blood draw in violation of CrR 3.1, that evidence is not tainted if an attorney could have done nothing other than instruct the defendant to submit to the blood test. Schulze, 116 Wn.2d at 164.

Nevertheless, Smith asserts that an attorney could have arranged for him to undergo an independent blood test if not for his sedation and the long delay in giving him access to an attorney following his arrest.[17] Smith avers that he had a right to an independent test pursuant to RCW 46.61.506(7), and that the denial of access to counsel prevented him from exercising that right because defense counsel could have advised him to undergo an additional test.

Smith's contention is unavailing because the record is devoid of any indication that Smith would have wanted to, or would have even been willing to, undergo an independent blood test. The record shows that Smith, after being read the special evidence warnings, which included a statement that Smith had the right to seek an independent test, did not request such a test. During pretrial hearings, Smith did not testify that he would have sought an independent test

_____

[17] Smith also asserts that an attorney could have ensured that the police obtained a second warrant authorizing sedation or could have suggested doing a breath test instead of a blood test. Such arguments are patently meritless. As discussed, a second warrant was unnecessary, and, furthermore, nothing in the record indicates that Smith would have stopped resisting the blood draw if a second warrant had been obtained. Also, because the officers had a valid warrant to obtain Smith's blood, they did not need to offer a breath test as an alternative. Even if an attorney had been contacted, Smith could only have been properly advised to submit to the blood draw pursuant to the warrant.

had he been able to discuss the subject with counsel. At trial, he again failed to assert that he would have sought an independent test.[18] Thus, even if there had been a violation of CrR 3.1, a violation premised on the denial of his right to be counseled regarding his right to seek an independent blood test would be harmless error.

None of Smith's contentions merit reversing the trial court's decision to admit the evidence obtained from Smith's blood sample.

III

Smith next contends that his statements at the hospital, as testified to by the officers and hospital staff, should have been ruled inadmissible as violating his Fifth Amendment rights. This is so, Smith asserts, because his statements were the product of police coercion and were not voluntary. We disagree.

The Fifth Amendment "protects a person from being compelled to give evidence against himself or herself." State v. Unga, 165 Wn.2d 95, 100-01, 196 P.3d 645 (2008). A statement of the defendant is coerced when it is obtained by promises or misrepresentations made by law enforcement that overcome the defendant's free will. State v. Broadaway, 133 Wn.2d 118, 132, 942 P.2d 363 (1997). "If statements are freely given, spontaneous and not the product of custodial interrogation, they are considered voluntary." State v. Peerson, 62 Wn. App. 755, 774, 816 P.2d 43 (1991).

Smith asserts that we should follow the reasoning from the following

---

[18] Furthermore, Smith "stuck to his guns" at trial as to his claimed fear of needles. There is no reason to believe that he would have voluntarily undergone an additional blood test on the night of the collision—an act that would have undercut his claim of fear.

- 20 -

passage in Schmerber that discussed the possibility of the prosecution obtaining incriminating statements during the administration of physical tests.

> Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it wishes to compel persons to submit to such attempts to discover evidence, the State may have to forgo the advantage of any *testimonial* products of administering the test . . . . [T]here may be circumstances in which the pain, danger, or severity of an operation would almost inevitably cause a person to prefer confession to undergoing the "search," and nothing we say today should be taken as establishing the permissibility of compulsion in that case.

Schmerber, 384 U.S. at 765 n.9.

Smith admits that the officers at the hospital did not explicitly interrogate him, but avers that, as suggested by the Court in Schmerber, his statements made while he was being physically tested, confronted with needles, and "beaten and drugged," were not voluntary. But the applicability of Smith's proffered passage from Schmerber is not supported by the record herein. A blood draw is, as the Court in Schmerber recognized, a common procedure and, for most people, involves virtually no risk, trauma, or pain. 384 U.S. at 771. There was no testimony presented at pretrial hearings to support a finding that Smith's claimed fear of needles was genuine. Thus, there was no reason to find that the procedure posed an exceptional likelihood of inducing a confession. And, indeed, Smith made no such confession. Additionally, all of the statements made by Smith at the hospital that were admitted at trial were uttered prior to Smith's sedation. During pretrial hearings, Beattie testified that Smith, without prompting from any officer, volunteered his comments about a fear of needles, religious

opposition to a blood draw, and allergies to sedatives. The statements were properly admitted.

IV

Smith next contends that his counsel were constitutionally ineffective because they failed to assert that the admission of the statements Smith made at the hospital violated his statutory physician-patient privilege.

"A defendant is denied effective assistance of counsel if the complained-of attorney conduct (1) falls below a minimum objective standard of reasonable attorney conduct, and (2) there is a probability that the outcome would be different *but for* the attorney's conduct." State v. Benn, 120 Wn.2d 631, 663, 845 P.2d 289 (1993) (citing Strickland v. Washington, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). If counsel's conduct was a conceivable tactical decision that a reasonable attorney might have made, then it cannot constitute ineffective assistance of counsel. State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

The physician-patient privilege is statutory, derived from RCW 5.60.060(4), and is applied in the criminal context via RCW 10.58.010. State v. Smith, 84 Wn. App. 813, 820, 929 P.2d 1191 (1997). The privilege protects statements made in the course of treatment. State v. Salas, 1 Wn. App. 2d 931, 950, 408 P.3d 383, review denied, 190 Wn.2d 1016 (2018). However, even when the privilege applies, the party asserting it can waive the privilege by the nature of the defense asserted. Smith, 84 Wn. App. at 822. A person waives the privilege by voluntarily placing his or her physical condition at issue in a judicial

- 22 -

proceeding. Carson v. Fine, 123 Wn.2d 206, 213-14, 867 P.2d 610 (1994).

Smith's assertion of ineffective assistance of counsel fails because Smith waived the physician-patient privilege by placing his physical condition at issue, and such waiver is explainable as a conceivable tactical decision of a reasonable attorney. Given that Smith claimed in a pretrial motion that the evidence of the blood draw should have been suppressed because he was sedated in order to obtain the evidence, he necessarily placed his physical condition at issue. There is no way that the trial court could have ruled on the reasonableness of sedating Smith without hearing testimony from the doctor who determined that sedating him would be safe and effective. Furthermore, moving to suppress evidence of a blood test in a vehicular homicide case on the ground that the blood was obtained in an unlawful manner is a conceivable tactical decision that a reasonable attorney would make. Smith's counsel was not constitutionally ineffective.

V

Finally, Smith contends that the trial court's instructions to the jury on the burden of proof regarding superseding causes violated his right to due process and that such error was prejudicial. Specifically, Smith urges us to follow the recent decision of Division Two in State v. Imokawa, 4 Wn. App. 2d 545, 555, 422 P.3d 502 (2018), which held that, in a vehicular homicide case, jury instructions that failed to unambiguously explain that the State has the burden of proof regarding the absence of superseding causes violated due process. In response, the State asserts that we should apply a different analysis, that

expressed in our decision in State v. Roggenkamp, 115 Wn. App. 927, 64 P.3d 92 (2003), aff'd, 153 Wn.2d 614, 106 P.3d 196 (2005), and that, even were we to follow Imokawa, any error in the jury instructions constituted harmless error. We agree with Smith that the Imokawa analysis is correct. But the State is correct that the error was harmless.

A

"Instructions satisfy the requirement of a fair trial when, taken as a whole, they properly inform the jury of the applicable law, are not misleading, and permit the defendant to argue his theory of the case." State v. Tili, 139 Wn.2d 107, 126, 985 P.2d 365 (1999). A trial court's decision regarding a jury instruction is reviewed for an abuse of discretion if the decision is based on the factual record but is reviewed de novo if the decision is based on issues of law. State v. Walker, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998).[19]

The Imokawa court held that the defense of a superseding cause necessarily negates the essential element of proximate cause for the crime of vehicular homicide and that the jury therein was not unambiguously informed of the State's burden of proof in this regard. 4 Wn. App. 2d at 556-57. In so holding, Division Two relied upon our Supreme Court's decision in State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). Therein, the court explained that instructions violate a defendant's right to due process when they place the

_____

[19] This issue, raised for the first time on appeal, is properly before us pursuant to RAP 2.5(a), which permits review of manifest errors affecting constitutional rights. See State v. Kalebaugh, 183 Wn.2d 578, 583-84, 355 P.3d 253 (2015) (explaining that an improper jury instruction that misstated the burden of proof to the jury by incorrectly defining reasonable doubt could be challenged for the first time on appeal).

burden of proving a defense on the defendant when that defense necessarily negates an essential element of the crime charged. W.R., 181 Wn.2d at 762. In such cases, the State "must prove the absence of the defense as part of proving all essential elements of the crime beyond a reasonable doubt." Imokawa, 4 Wn. App. 2d at 553. Furthermore, when the State has the burden to prove the absence of a defense, the jury must be unambiguously informed that the State has to prove the absence of the defense beyond a reasonable doubt. State v. Acosta, 101 Wn.2d 612, 621, 683 P.2d 1069 (1984). While an explicit instruction to this effect is preferable, it is not required as long as the instructions, "taken as a whole, make it clear that the State has the burden." Acosta, 101 Wn.2d at 621.

Applying this "negates an element" analysis, the Imokawa court held that a superseding cause necessarily negates the essential element of proximate cause for the crime of vehicular homicide. 4 Wn. App. 2d at 556-57. The court explained that "it is impossible for the defendant's driving to be a proximate cause of the injury or death *and* for there to also be a superseding cause of the injury or death. Therefore, the two cannot coexist and a superseding cause negates proximate cause." Imokawa, 4 Wn. App. 2d at 555.

The trial court in Imokawa gave standard Washington Pattern Jury Instructions related to proximate cause and superseding causes, specifically WPIC 90.07 and WPIC 90.08. 4 Wn. App. 2d at 552. These instructions did not include any language requiring the State to prove the absence of a superseding cause, nor did any other instruction provided by the trial court provide language indicative of the State's burden. Imokawa, 4 Wn. App. 2d at 552. Therefore, the

court concluded, the pattern jury instructions failed to unambiguously inform the jury of the State's burden, thereby violating the defendant's due process rights. Imokawa, 4 Wn. App. 2d at 557.

We decline the State's invitation to apply the analysis used in Roggenkamp. The Roggenkamp analysis relies on a decision of our Supreme Court, State v. Camara, 113 Wn.2d 631, 781 P.2d 483 (1989), that was overruled in W.R. 181 Wn.2d at 762. The Imokawa court correctly followed the decision in W.R.

Here, the jury instructions for proximate cause and superseding causes were taken from WPIC 90.07 and WPIC 90.08 and were practically identical to those given in Imokawa. Also similarly to Imokawa, no other instructions provided to the jury here indicated that the State bore the burden of proving the absence of a superseding cause beyond a reasonable doubt. Applying the analysis employed in Imokawa, we conclude that the instructions at issue herein were constitutionally deficient.

B

"Jury instructions that violate a defendant's right to due process require reversal unless the State can prove that the error was harmless beyond a reasonable doubt." Imokawa, 4 Wn. App. 2d at 559 (citing State v. Brown, 147 Wn.2d 330, 339, 58 P.3d 889 (2002)). An error is harmless if it is clear beyond a reasonable doubt that the outcome of the trial would have been the same even in the absence of the error. State v. Souther, 100 Wn. App. 701, 709-10, 998 P.2d 350 (2000). In a vehicular homicide case, if the defendant presents evidence

- 26 -

that could establish a superseding cause, and the only issue related to the evidence was a question of credibility for the jury, then the erroneous jury instructions were not harmless. Imokawa, 4 Wn. App. 2d at 559. A superseding cause is an intervening cause that is not reasonably foreseeable. Roggenkamp, 115 Wn. App. at 945. "An intervening cause is a force that operates to produce harm *after* the defendant has committed the act or omission" of which he has been accused. Roggenkamp, 115 Wn. App. at 945.

In Souther, we held that any potential error from the constitutionally insufficient jury instructions issued therein was harmless. 100 Wn. App. at 711. Therein, the defendant asserted that speeding and improper display of a left hand turn signal by the victim were superseding causes. Souther, 100 Wn. App. at 710. In rejecting this assertion, the court explained that even if the victim was speeding or had a turn signal on when the victim was not turning, such actions could not be considered intervening causes because they did not occur *after* Souther's act of turning left in front of the motorcycle. Souther, 100 Wn. App. at 710.

Here, Smith presented evidence that he claimed showed that there were potential superseding causes for the collision between his car and Schuylman's motorcycle, but which showed only circumstances that existed prior to Smith's act of turning left. In closing argument, Smith's attorney argued that the headlight on Schuylman's motorcycle may have been out prior to and at the time of the collision, and that this operated as a superseding cause because it made the motorcycle invisible to Smith. The crux of Smith's argument was that Smith

was unable to see the motorcycle prior to making his turn. Thus, Smith's argument was based on an event that occurred prior to Smith's act while driving (turning left) that caused the collision. Such a prior event cannot be a superseding cause. Therefore, because Smith did not present any evidence of a superseding cause, the failure to provide a constitutionally sufficient superseding cause instruction to the jury was harmless beyond a reasonable doubt. The deficient jury instructions do not require reversal.

    Affirmed.

                          _____, J.

We concur:

_____, J.        _____, C.J.